STATE OF NORTH CAROLINA v. STEPHEN ARCHIE SHORES

No. COA01-1435

(Filed 31 December 2002)

**Constitutional Law—right to remain silent—comment upon**

The trial court erred in a second-degree murder prosecution by allowing the prosecutor to ask defendant about his post-arrest silence and then to comment on that silence during closing arguments. It seems probable that the prosecutor's questions and argument contributed to defendant's conviction because his testimony about the threat posed by the victim was crucial to self-defense and the State's examination and closing argument left the jury with the inference that part of defendant's testimony was an after-the-fact creation.

Appeal by defendant from judgment entered 20 February 2001 by Judge Jerry Cash Martin in Surry County Superior Court. Heard in the Court of Appeals 17 September 2002.

**STATE v. SHORES**

[155 N.C. App. 342 (2002)]

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*Appellate Defendant Staples S. Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for defendant-appellant.*

THOMAS, Judge.

Defendant, Stephen Archie Shores, appeals from judgment entered on his conviction of second degree murder. For the reasons herein, we order a new trial.

Defendant contends the trial court erred by (1) admitting evidence of his post-arrest silence and allowing the State to comment on such evidence in closing argument, (2) failing to intervene *ex mero motu* to correct two grossly improper comments made by the State's attorney during closing argument, (3) admitting irrelevant and highly prejudicial evidence of defendant's prior threats against unrelated third parties, (4) admitting irrelevant and prejudicial evidence of other crimes committed by defendant, and (5) denying his request for a jury instruction on the duty to retreat.

The State's evidence tends to show defendant and the victim, Albert Shore, were in Jerry's Lounge in Surry County with four other people on Sunday, 8 August 1999. Shore arrived there early in the evening and proceeded to use cocaine and drink alcohol. Defendant arrived at approximately 9:30 p.m., drank beer, played pool, sat in his favorite bar stool, and generally kept to himself.

At approximately 11:15 p.m., the bartender announced "last call." Defendant was sitting at the bar and had not talked to Shore during the evening. Shore walked past defendant on his way to the bathroom and called defendant a "narc." Shore suspected defendant had informed on two people recently arrested for illegal drug possession. When Shore came out of the bathroom, defendant said, "I know you ain't talking about me because I ain't done nothing." Shore replied, "I'm not talking about you, but I can be." Shore then walked behind the bar and began arguing with defendant, calling defendant an "SOB" and telling him "to leave" because he was "barred" from the lounge.

As the argument between the two escalated, Shore grabbed defendant's beer bottle from his hand and smacked him in the face. Defendant fell and then moved away from the bar. Shore continued to shout, "You're fucking barred and don't ever come back." Shore then

threw the beer bottle at defendant. The bottle hit defendant and exploded. Defendant continued to move back.

Shore came from behind the bar, approached defendant, and began punching him. Defendant fell to the floor and covered his head. Shore continued punching defendant in the head, hitting him approximately thirty times. Shore eventually stopped, grabbed defendant by the neck, dragged him across the floor and threw him outside.

Defendant reentered the bar approximately ten to twenty seconds later holding a pistol. Shore ducked behind one side of a pool table while defendant ducked behind the other. Defendant then fired a shot. Shore stood up and defendant fired a second shot. Shore fell to the floor with defendant firing a third shot and finally leaving the lounge. The autopsy showed Shore suffered three gunshot wounds.

Defendant voluntarily surrendered at approximately 5:29 a.m., on 9 August 1999. He was read his *Miranda* rights and stated, "The only reason I did it, I was afraid of him. I thought he was going to kill me." Defendant was then taken to the hospital and treated for injuries he suffered during the altercation.

Defendant was subsequently transported from the hospital to the police station where he was again advised of his *Miranda* rights, both orally and in writing. Defendant waived his rights and gave an oral statement. He said Shore reached across the bar and hit him in the eye, threw a beer bottle at him, knocked him to the floor, and beat him on the head several times. He then pulled a gun from his right rear pocket and shot Shore a couple of times.

Defendant, meanwhile, testified that he arrived at Jerry's Lounge around 9:30 p.m. and was sitting at the bar at "last call." He and Shore were not having any problems with one another that night when Shore suddenly approached him from behind, hit him on the head, grabbed his beer bottle and ordered him to "get out." Defendant backed toward the door. Shore then threw the beer bottle at him. The bottle hit defendant on the side of the head and exploded. At that time, defendant "wasn't moving too good" and "was pretty-much addled." Shore then approached defendant, grabbed him by the hair, threw him to the floor, and began beating him over the head. Defendant testified, "[Shore] hit me a lot of times. I was begging him to stop, but he just kept hitting me . . . every time he hit me I could see stars." Defendant tried to cover his head and did not strike back.

Shore finally let defendant up, but then kicked defendant in the rear and out the front door of the bar. Shore, standing in the doorway as defendant fell to the ground, said, "[I am] going to get [my] gun and kill [you]."

As Shore went back inside the bar, defendant became fearful that Shore was going to retrieve a gun and come back out to shoot him. Defendant pulled his .25 caliber pistol from his pants pocket and immediately reentered the bar. Shore saw defendant, moved to his left and crouched behind a pool table. Defendant then heard someone yell "he's got a gun." He thought Shore had retrieved a gun so defendant then ducked behind the other end of the pool table.

According to defendant, Shore stood up and started approaching him. Defendant responded by firing one shot. Shore "kept coming around the table" so defendant fired again. Shore "still kept coming," and was within three feet of defendant, so defendant fired a third shot from his crouched position. Shore fell to the floor and defendant left the lounge. Defendant testified to firing "three rapid succession shots" all within "maybe five seconds" and stated that when he shot "I was in fear of my life."

The jury was instructed on first degree murder, second degree murder, voluntary manslaughter and not guilty. It returned a verdict of guilty of second degree murder and defendant was sentenced accordingly.

Defendant first contends the trial court erred in allowing the State to ask questions regarding his post-arrest silence and then to comment on such evidence during closing argument. We agree.

The evidence shows defendant was arrested at approximately 5:29 a.m., on 9 August 1999, and orally advised of his *Miranda* rights, including the right to remain silent. Defendant then stated, "The only reason I did it, I was afraid of him. I thought he was going to kill me." Later that morning, at approximately 9:10 a.m., defendant was taken to the police station and advised both orally and in writing of his *Miranda* rights. Defendant waived his rights and gave a short statement. He said Shore had reached across the bar and hit him in the eye, threw a beer bottle at him, knocked him to the floor, and beat him on the head several times. He then pulled a gun from his right rear pocket and shot Shore a couple of times.

Defendant exercised his right to remain silent from that point until his testimony at trial.

**STATE v. SHORES**

[155 N.C. App. 342 (2002)]

On direct examination, defendant testified to a full exculpatory account of the events. He stated Shore kicked him several times and out the lounge's front door, and threatened from the doorway "to get his gun and kill [defendant]." Defendant responded by pulling his gun from his pocket and returning inside.

During cross-examination, the State's attorney repeatedly questioned defendant about whether he had ever informed law enforcement that Shore kicked him out the front door of the lounge and threatened to kill him. The following are excerpted portions of the exchange between the prosecutor and defendant:

Q. Mr. Shore—Shores, this story that you've told the ladies and gentlemen of the jury today, have you told anybody else this story?

A. No, sir. My attorney is all.

Q. Sir?

A. My lawyer.

Q. Your lawyer. Anybody else?

A. No.

Q. You haven't told the DA's office, have you?

A. No, sir.

Q. Haven't told the investigating officer, Johnny Belton, have you?

A. No.

Q. Haven't told any other officers, have you?

A. No, sir.

Q. Haven't went over to the Sheriff's Department and told them that story, have you?

MR. GARY VANNOY: Objection, Your Honor.

THE COURT: Court will sustain.

Q. Did you tell anybody other than your lawyer?

MR. GARY VANNOY: Objection.

THE COURT: Objection overruled. You may answer.

A. No, sir.

. . .

Q. Mr. Shore [sic], you didn't call up Officer Cook and say, listen, I want to add some more to that statement, did you?

A. No, sir.

Q. You didn't call him up and say, listen, I want to tell you how he said he had a gun, he was going to go get it and kill me. You didn't call him up and tell him that, did you?

A. No, sir.

Q. You didn't call him up and say, listen, I want to tell you about how he was kicking me also.

A. No, I didn't. I didn't know I could do that.

Q. Between August the 8th, 1999 and today you didn't know that you could call up the officer and tell him your story?

MR. GARY VANNOY: Objection.

THE COURT: Objection overruled. You may answer.

A. No, I didn't know.

. . . .

During the State's rebuttal case, the prosecutor also questioned Officer Cook concerning defendant's exercise of his right to remain silent following his 9 August 1999 statement. The following exchange took place.

Q. Did [defendant] ever tell you about any kicking incident in which Albert Shore kicked Stephen Shores down and kicked him on the floor?

MR. GARY VANNOY: Objection.

THE COURT: Objection overruled. You may answer.

A. No, sir, he didn't.

Q. Did he at any time tell you about any kicking?

A. No, sir.

STATE v. SHORES

[155 N.C. App. 342 (2002)]

Q. Did he at any time tell you that Albert Shore said, "I've got a gun; I'm going to go get it, and I'm going to kill you?"

A. No, sir.

Q. Did he at any time tell you that after stepping outside he walked back in the place of business and had a gun that was on his hip and he pulled it out?

A. No, sir.

. . .

Q. At any time after you advised him of his rights, he gave you that statement, did he ever come to you again and tell you anything additional?

A. No, sir.

MR. GARY VANNOY: Objection.

THE COURT: Objection overruled.

Q. Did he at any time call you and tell you any additional statements?

A. No, sir.

. . . .

Finally, the prosecutor made reference to defendant's silence during his closing argument:

Ladies and gentleman of the jury, what would be wrong when you're represented by a lawyer [with] calling up the police or having the lawyer call them up and say "let me tell you some more, let me tell you the rest of this?" He didn't do that. He didn't call the DA's office. He didn't call any police officer. He didn't call the investigating officer. He didn't do any of that. Right on that stand he said "I have told this story for the first time today other than [to] my lawyers."

Ladies and gentlemen of the jury, ask yourself now "why on earth would I wait until now to try to tell that story if I had that kind of story? Why would I do that?

. . . .

"It is well established that a criminal defendant has a right to remain silent under the Fifth Amendment to the United States

Constitution, as incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution." *State v. Ward*, 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001).

The United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976), that it is fundamentally unfair and a deprivation of a defendant's due process rights under the Fourteenth Amendment to impeach the defendant on cross-examination by questioning him about his silence. *Id.* at 618, 49 L. Ed. 2d at 98; *accord State v. Hoyle*, 325 N.C. 232, 236, 382 S.E.2d 752, 754 (1989); *State v. Williams*, 67 N.C. App. 295, 298-99, 313 S.E.2d 170, 172 (1984). This is so because once a person under arrest has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), which includes the right to remain silent, there is an implicit promise that his silence will not be used against him. *Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98; *Hoyle*, 325 N.C. at 236, 382 S.E.2d at 754.

In *Hoyle*, the defendant was arrested, charged with murder and advised of his *Miranda* rights. He told the officers he would not sign a waiver of his rights without a lawyer being present but that he would answer some questions. He then answered some of the officers' questions but when asked "what happened when the [victim] followed him to his truck?" he replied he would "rather not say without having talked with his lawyer." The officers did not question him further.

At trial, the defendant testified that he was attacked by the victim when he went to his truck, the two men struggled for defendant's gun, and, during the struggle, the gun discharged and the victim was shot. The prosecutor repeatedly questioned both the officer and defendant as to whether the defendant had informed anyone that the victim had attacked him on the night of the murder. The prosecutor also made references in his closing argument to the defendant's failure to tell the police of his defense.

The Supreme Court held that the prosecutor's questions and argument to the jury violated the defendant's right to not have his silence used against him. *Hoyle*, 325 N.C. at 237, 382 S.E.2d at 754.

In *State v. Lane*, 301 N.C. 382, 271 S.E.2d 273 (1980), the defendant was arrested and transported to the police station where a detective began reading the indictments to him. The defendant, who had not been given his *Miranda* warnings, interrupted the reading of the indictments and stated, "Hell, I sold heroin before, but

I didn't sell heroin to this person." He made no other statements to the officers.

At trial, defendant testified to an alibi that placed him out of town on the night of the alleged crime. On cross-examination, the State's prosecutor was permitted over the defendant's objection to ask whether he had previously told the police, any of the district attorneys or anyone else about the alibi to which he testified at trial.

On appeal, the Supreme Court first noted that, with or without *Miranda* warnings, the defendant's exercise of his right to remain silent was guaranteed by the state and federal constitutions. The Court reasoned that the defendant's failure "to state his alibi defense at the time the indictment was being read to him or at any time prior to trial did not amount to a prior inconsistent statement." Therefore, the Court concluded it was prejudicial error to allow the defendant to be cross-examined as to why he did not tell the officers of the alibi he used at trial. *Id.* at 387, 271 S.E.2d at 277.

Recently, in *State v. Ward*, 354 N.C. 231, 555 S.E.2d 251 (2001), our Supreme Court addressed the use of a defendant's right to remain silent in the context of a closing argument in a capital sentencing proceeding. There, the defendant gave a statement to police after being arrested in which he denied his participation in the crimes. He stated that on the day of the murder he woke up at 7:45 a.m. and stayed with his wife and father.

At the sentencing hearing, the prosecutor argued the following regarding the defendant's post-arrest silence while at Dorothea Dix Hospital:

> He started out that he was with his wife and child or wife and children or something on that morning. We know he could talk, but he decided just to sit quietly. He didn't want to say anything that would "incriminate himself." So he appreciated the criminality of his conduct all right.
>
> He was mighty careful with who [sic] he would discuss that criminality, wasn't he? He wouldn't discuss it with the people at Dix.

*Id.* at 266, 555 S.E.2d at 273.

After recognizing a defendant's general right to remain silent under the state and federal constitutions, the Supreme Court stated:

A defendant's decision to remain silent following his arrest may not be used to infer his guilt, and any comment by the prosecutor on the defendant's exercise of his right to silence is unconstitutional. "A statement that may be interpreted as commenting on a defendant's decision [to remain silent] is improper if the jury would naturally and necessarily understand the statement to be a comment on the [exercise of his right to silence.]".

Applying these principles to the argument in question, we hold that the prosecutor impermissibly commented on defendant's silence in violation of his rights under the state and federal Constitutions. As we noted in *Mitchell*,

"district attorneys and assistant district attorneys have a duty as officers of the court and as advocates for the people to conduct trials in accordance with due process and the fair administration of justice and should thus refrain from arguments that unnecessarily risk being violative of a defendant's constitutional rights, thereby necessitating new trials."

*Id.* (citations omitted).

Here, we are constrained to hold that the rule set forth in *Doyle* and applied by our Supreme Court in *Hoyle, Lane* and *Ward* was violated in this case. Defendant initially waived his right to remain silent and gave police two statements on 9 August 1999 describing the incident. At trial, he gave a more detailed exculpatory account of the incident. His account at trial was not inconsistent with the statements given to police. He merely provided more detail concerning his fear that Shore was going to kill him.

From 9 August 1999 until his testimony at trial, defendant had a constitutional right to remain silent. The State attorney's questions and his argument to the jury violated defendant's right to remain silent.

A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

N.C. Gen. Stat. § 15A-1443(b) (2001); *Hoyle,* 325 N.C. at 237, 382 S.E.2d at 754. The test is whether the appellate court can declare a

belief that there is no reasonable possibility that the violation might have contributed to the conviction. *Lane*, 301 N.C. at 387, 271 S.E.2d at 277.

Here, we are required by applicable precedent to hold that there was a violation of defendant's constitutional rights. The State's cross-examination of defendant, examination of the officer and closing argument attacked defendant's exercise of his right against self-incrimination in such a manner as to leave a strong inference with the jury that part of defendant's testimony was an after-the-fact creation. Defendant's testimony about Shore's threat was crucial to his defense which centered on self-defense and heat of passion. It seems probable that the State's questions and its closing argument contributed to his conviction. Since we cannot declare beyond a reasonable doubt that there was no reasonable possibility that the prosecutor's conduct might have contributed to defendant's conviction, we hold it was sufficiently prejudicial to warrant a new trial.

Three of defendant's remaining assignments of error are not sufficiently likely to occur at a new trial, so we decline to address them. We do wish, however, to briefly address defendant's contention that the trial court erred in not intervening *ex mero motu* in the State's closing argument, which he contends contained two grossly improper remarks.

We take this opportunity to bring attention to our Supreme Court's recent decision in *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002). It emphasized an attorney's professional and ethical responsibilities to avoid closing arguments which are abusive, injected with personal opinion and experience or otherwise stray from the record. *Id.* at 134-35, 558 S.E.2d at 108-09.

For the reasons herein, we award defendant a new trial.

New trial.

Chief Judge EAGLES and Judge MARTIN concur.