STATE OF NORTH CAROLINA v. YAW OSEI ADU

No. COA08-582

(Filed 3 February 2009)

**1. Rape— statutory—physical findings—evidence of other abuse—insufficient for alternate explanation of physical findings—excluded**

The trial court did not err in a prosecution of the victim's stepfather for statutory rape and indecent liberties by excluding under the rape shield statute evidence of prior sexual abuse of the victim by her grandfather where the excluded evidence was insufficient to establish an alternate explanation for physical findings. N.C.G.S. 8C-1, Rule 412.

**2. Constitutional Law— right to remain silent—questions concerning failure to make statement—closing argument—harmless error**

There was harmless error in a prosecution for statutory rape and indecent liberties where the State was allowed to question defendant about his failure to make a statement to law enforcement and the State was allowed to reference defendant's silence in its closing argument. There was substantial other evidence of guilt.

Appeal by Defendant from judgment entered 23 October 2007 by Judge John O. Craig, III in Superior Court, Guilford County. Heard in the Court of Appeals 19 November 2008.

*Attorney General Roy Cooper, by Assistant Attorney General Jane Rankin Thompson, for the State.*

*Robert W. Ewing for Defendant.*

McGEE, Judge.

A jury found Yaw Osei Adu (Defendant) guilty on 6 August 2004 of first-degree statutory rape and indecent liberties with a child. The State's evidence at trial tended to show that Defendant was married to Nellie Adu (Ms. Adu) in 1996. Defendant lived with Ms. Adu and her daughter, S.A., after the marriage. S.A. testified at trial that in April 2002 she asked Defendant to buy her some clothes and a new bra because all of her bras were torn. Defendant told S.A. that he needed

to see her breasts to see what size they were. S.A. lifted her shirt and took off her bra to show Defendant her bra size. S.A. testified that Defendant started sucking her breasts.

S.A. testified that Defendant picked her up and carried her over Defendant's shoulder into her bedroom. Defendant placed S.A. on her bed, climbed on top of her and started sucking her breasts again. Defendant kissed S.A. on her mouth and started "rocking back and forth" on top of her. After a few minutes, Defendant unzipped his pants, pulled down S.A.'s pants, and tried to insert his penis into S.A.'s vagina. S.A. told Defendant that this hurt her. Defendant waited a few moments before again trying to insert his penis into S.A.'s vagina. S.A. told Defendant that "it still hurts," and S.A. pulled her pants up. S.A. testified that Defendant turned S.A. over onto her stomach and started "rocking' back and forth on [S.A.'s] rear end." S.A. told Defendant she needed to go to the bathroom. In the bathroom, S.A. "prayed . . . [Defendant would] stop." S.A. returned to the bedroom and Defendant again "rock[ed] back and forth" on top of her. S.A. asked Defendant to stop, and he stopped. S.A. testified that she made Defendant place his hand on the Bible and swear he would never touch her again. Defendant made S.A. swear to never tell anyone because if she did, Defendant and Ms. Adu "would have to get a divorce." S.A. testified that she felt "too dirty" to tell Ms. Adu what had happened when Ms. Adu returned home from work that day.

S.A. testified that on a later occasion, Defendant hugged S.A. and began kissing her while Ms. Adu was out of the house at work. Defendant laid S.A. down and began rocking back and forth on top of her as he had done before. S.A. testified she could feel Defendant's penis through his blue jeans. S.A. said she again felt too dirty to tell Ms. Adu what happened that day.

About a week later, S.A. told Ms. Adu that Defendant had rocked back and forth on top of her, and that he had kissed her on the mouth and breasts. The next day, Ms. Adu asked S.A. to tell her what happened in the presence of Defendant. S.A. told Ms. Adu and Defendant that Defendant had rocked back and forth on top of her and sucked her breasts. Defendant said that he and S.A. were just wrestling. S.A. testified that it was not wrestling.

S.A. further testified that she accompanied Defendant and Ms. Adu to speak with their pastor, Pastor Longobardo. Pastor Longobardo testified that he spoke with Defendant on 12 July 2002, and that Defendant had told him he had had "some bodily con-

tact" with S.A. Defendant told Pastor Longobardo that although he used his hands while touching S.A., no penetration had occurred. Pastor Longobardo also testified that Defendant said that none of the contact he had with S.A. would be viewed as inappropriate in his home country.

Sheronda Harris (Harris), an investigator with the child protective services division of the Guilford County Department of Social Services (DSS), testified for the State. Harris testified that on 18 July 2002, Ms. Adu reported inappropriate sexual conduct had occurred between S.A. and Defendant. Harris interviewed Defendant at his home and Defendant told Harris he used to wrestle with S.A. "like she was a boy." Defendant told Harris he had held S.A.'s breasts while wrestling and that he had ended up on top of her at one point. He admitted his conduct was inappropriate.

Harris testified that after speaking with Defendant, she spoke with S.A. that same day. S.A. told Harris that she "had had sex with [Defendant]" based on overhearing girls at school say sex was how babies were made. Harris allowed Defendant to remain in the home at that point, but he was not permitted to have any unsupervised contact with S.A. The following day, 19 July 2002, Harris asked Defendant to move out of the family home. Harris referred S.A. to Family Services of the Piedmont and also to Dr. Angela Stanley (Dr. Stanley) at the Child Evaluation Clinic of the Moses Cone Health System, for a medical exam. After DSS received the results from Dr. Stanley's examination, DSS substantiated its report of sexual abuse by Defendant.

Dr. Stanley testified that a genital examination of S.A. revealed a notch or healed tear at her hymen's 9:00 o'clock position, which was consistent with genital penetration. Based on her physical examination of S.A., Dr. Stanley found a possible certainty of sexual maltreatment.

Ms. Adu testified on *voir dire* that her father, S.A.'s grandfather, had lived in their family home until 1998. Ms. Adu testified that they lived in a two-bedroom home, and that her father chose to move out after the birth of Ms. Adu's other daughter because there was so little room. During the summer of 1999, after Ms. Adu's father had moved out of the home, Ms. Adu took S.A. and a friend to visit her father. About a month after this visit, S.A. told Ms. Adu that she did not want to visit her grandfather again because he had kissed her and " 'stuck his tongue in [S.A.'s] mouth.' " Ms. Adu testified that she had found a

stain on S.A.'s grandfather's underwear and blood on S.A.'s underwear. Ms. Adu stated the spot on S.A.'s grandfather's underwear was the result of a boil on his buttocks, and that the blood on S.A.'s underwear was from S.A.'s beginning her period.

Defendant filed a motion pursuant to N.C. Gen. Stat. § 8C-1, Rule 412 requesting that the trial court allow him to present evidence of prior sexual abuse of S.A. by her grandfather as an alternative explanation for the trauma to her vaginal area. At the Rule 412 hearing, Defendant testified that S.A.'s grandfather had lived in their home until Ms. Adu found blood on S.A.'s panties and on S.A.'s grandfather's underwear. Defendant testified that Ms. Adu confronted S.A.'s grandfather and kicked him out of the residence because "he had raped [S.A.]" Defendant also presented as evidence S.A.'s taped interview in which S.A. stated that "[w]hat happened to me [with Defendant] is something similar to what happened . . . . with my grandfather."

During the Rule 412 hearing and at trial, Defendant argued that the fondling by S.A.'s grandfather caused the trauma to S.A.'s vagina. Upon a finding that there was no credible evidence of penetration by S.A.'s grandfather that could serve as an alternate explanation to the vaginal trauma, the trial court denied Defendant's Rule 412 motion. Thus, the trial court ruled that Defendant could not present any evidence concerning S.A.'s grandfather's prior sexual abuse of S.A. and redacted any mention of the prior sexual abuse stated in S.A.'s videotaped statement and in Dr. Stanley's medical report.

Defendant testified in his own defense and denied the allegations. Defendant also testified that he was a third-degree black belt in Tae Kwon Do and that he did touch S.A. when giving her Tae Kwon Do lessons. However, Defendant stated that he did not touch S.A. in an inappropriate way.

During the State's recross-examination of Defendant, the following exchange occurred:

THE STATE: [Defendant], you testified that you were never given an opportunity to provide a written statement to anybody; isn't that right?

DEFENDANT: Yes.

THE STATE: And isn't it true, [Defendant], that when you took [S.A.] to Family Services of the Piedmont that you had a conversation with Detective Hines [of the Greensboro Police Department] in the parking lot?

DEFENDANT: Yes. I didn't know she was [a] detective at the time.

. . . .

THE STATE: And she said that if you came [to] meet her, you'd have a chance to tell your side of the story, didn't she?

. . . .

DEFENDANT: She didn't explain it. She told me to come to her office.

THE STATE: And did you ever go into her office and tell her your side of the story?

. . . .

DEFENDANT: Yeah. When I was going, my wife came to me and told me that we need to get an attorney.

THE STATE: Did you ever go in and meet with Detective Hines and tell her your side of the story?

DEFENDANT: No.

During the State's closing argument, the State referenced Defendant's failure to speak with Detective Hines. The State asked: "Why didn't [Defendant] go and talk to Detective Hines when she offered him the opportunity to tell his side of the story?" Defendant objected to this statement but his objection was overruled.

The jury found Defendant guilty of first-degree statutory rape and indecent liberties with a child. Sentencing of Defendant was delayed because Defendant's whereabouts were unknown after 5 August 2004. Defendant was sentenced on 16 October 2007 to four consecutive active sentences with a combined total term of imprisonment of not less than 227 months and not more than 284 months with the North Carolina Department of Correction. Defendant appeals.

I.

[1] Defendant first argues that the trial court erred by excluding evidence of S.A.'s grandfather's sexual abuse of S.A. pursuant to Rule 412. We disagree.

N.C. Gen. Stat. § 8C-1, Rule 412(b)(2) (2007) provides that:

(b) Notwithstanding any other provision of law, the sexual behavior of the complainant is irrelevant to any issue in the prosecution unless such behavior:

(2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant[.]

Defendant argues that evidence of S.A.'s sexual abuse by S.A.'s grandfather was relevant pursuant to N.C.G.S. § 8C-1, Rule 412(b)(2) as an alternative explanation for the notching in S.A.'s vaginal area. In *State v. Ollis*, 318 N.C. 370, 376, 348 S.E.2d 777, 781, (1986), a child testified she had been raped by two men on the same day, and our Supreme Court held that it was error to exclude evidence of the second rape in the defendant's trial. Additionally, our Court held in *State v. Wright*, 98 N.C. App. 658, 662, 392 S.E.2d 125, 128 (1990), that it was error for the trial court to exclude evidence that the child victim masturbated with a washcloth and her fingers, when this would have been an alternative explanation for the child's red and irritated genitalia.

Unlike in *Ollis* and *Wright*, the excluded evidence in the case before us is insufficient to establish an alternative explanation for the physical findings in S.A.'s vaginal area. The evidence of sexual abuse of S.A. by her grandfather tended to show that S.A.'s grandfather had kissed S.A., but there was no evidence of abuse to S.A.'s vaginal area by her grandfather. The only evidence of S.A.'s grandfather's abuse that could have provided an alternative explanation for the notching on S.A.'s vaginal area was the evidence that Ms. Adu found blood on S.A.'s panties and on S.A.'s grandfather's underwear. However, Ms. Adu testified that the blood stain on S.A.'s panties was from S.A.'s period and the stain on S.A.'s grandfather's underwear was from a boil on his buttocks. Defendant presented no other evidence to refute Ms. Adu's testimony as to the stains. Accordingly, the evidence of the stains on S.A.'s panties and S.A.'s grandfather's underwear do not provide any evidence that the abuse by S.A.'s grandfather involved penetration. Thus, S.A.'s abuse by her grandfather would not have provided an alternative explanation for the notching on S.A.'s vaginal area and was properly excluded pursuant to Rule 412. Defendant's first assignment of error is overruled.

II.

[2] Defendant also argues that the trial court erred in allowing the State to question Defendant about his failure to make a statement to law enforcement and in allowing the State to reference Defendant's silence in the State's closing argument. We agree. However, we hold that this error was harmless beyond a reasonable doubt.

In *State v. Boston,* 191 N.C. App. 637, 651-52, 663 S.E.2d 886, 896 (2008), our Court held that a defendant's silence could not be used as substantive evidence of the defendant's guilt. In *Boston and Satterwhite,* the defendants were convicted of first-degree arson after the defendants and an accomplice set fire to a house. *Id.* at 640-41, 663 S.E.2d at 889-90. The trial court overruled defendant Boston's objection to the State's questioning of the accomplice about Boston's failure to submit to police questioning prior to Boston's arrest. *Id.* at 646-47, 663 S.E.2d at 893. We held that although the trial court erred in allowing the use of Boston's silence as substantive evidence of her guilt, the error was harmless beyond a reasonable doubt. *Id.* at 653-54, 663 S.E.2d at 897.

In the present case, the State argues that the references the State made at trial about Defendant's silence were used solely for impeachment purposes and not as substantive evidence of Defendant's guilt. However, the State also asked:

> If [Defendant] didn't do anything, why didn't he tell [Ms. Adu] that when she first told him? Remember, she said he didn't deny it? He didn't really fully admit it, but he didn't deny it. And when he went to Pastor Longobardo, he didn't say, "I absolutely did not do this." When he saw Sheronda Harris, he didn't say, "I did not do this." Why didn't he go and talk to Detective Hines when she offered him the opportunity to tell his side of the story?

Similar references by the State to a defendant's silence during closing arguments have been held to violate a defendant's Fifth Amendment right against self-incrimination. *See* U.S. Const. Amend. V. In *State v. Ward,* 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001), the State referenced the defendant's post-arrest silence after the defendant was convicted of felony murder during sentencing arguments to the jury. The State used the defendant's silence in an attempt to prove the defendant had the mental capacity to appreciate the criminality of his actions. *Id.* The State argued the following to the jury:

> He started out that he was with his wife and child or wife and children or something that morning. We know he could talk, but he decided just to sit quietly. He didn't want to say anything that would "incriminate himself." So he appreciated the criminality of his conduct all right.

*Ward,* 354 N.C. at 266, 555 S.E.2d at 273. Our Supreme Court held that the above comments on the defendant's silence violated the defendant's rights under both the N.C. and U.S. Constitutions. *Id.*

In *State v. Hoyle*, 325 N.C. 232, 382 S.E.2d 752 (1989), the defendant was on trial for first-degree murder and argued that he had acted in self-defense. The State made the following statement in its closing argument:

> Who said anything, until yesterday, about [the victim] having grabbed his gun? Who? When was there an opportunity to say that? For months and that night. You think what you would do. If somebody had severely beaten you, if somebody had caused you to think that you had to defend yourself, if somebody had struggled with you over a gun and had accidently shot themselves, don't you think, when the police were there and polite and nice and trying to get to the truth . . . don't you think you would tell him then?

*Id.* at 236, 382 S.E.2d at 754. Our Supreme Court held that the State's use of the defendant's silence violated the defendant's constitutional right to remain silent. *Id.* at 236-37, 382 S.E.2d at 754.

In *State v. Shores*, 155 N.C. App. 342, 573 S.E.2d 237, (2002), our Court granted the defendant a new trial and held that the State impermissibly questioned why the defendant, charged with second-degree murder and claiming self-defense, had failed to tell anyone prior to testifying at trial that the victim had threatened his life. *Id.* at 351-52, 573 S.E.2d at 242-43. The State in *Shores* made the following statement during its closing argument:

> Ladies and gentleman of the jury, what would be wrong when you're represented by a lawyer [with] calling up the police or having the lawyer call them up and say "let me tell you some more, let me tell you the rest of this?" He didn't do that. He didn't call the DA's office. He didn't call any police officer. He didn't call the investigating officer. He didn't do any of that. Right on that stand he said "I have told this story for the first time today other than [to] my lawyers."

> Ladies and gentlemen of the jury, ask yourself now "why on earth would I wait until now to try to tell that story if I had that kind of story? Why would I do that?"

*Shores*, 155 N.C. App. at 348, 573 S.E.2d at 240.

As in *Hoyle*, *Ward*, and *Shores*, the State in this case referenced Defendant's silence to insinuate that an innocent man would have freely spoken with Detective Hines, and that Defendant's failure to do

so permitted an inference of guilt. We hold the State's comments during its closing argument violated Defendant's Fifth Amendment right against self-incrimination.

The State argues that even if it was error to allow the State to question Defendant about his lack of statements to law enforcement, and to mention this failure during closing arguments, it was harmless beyond a reasonable doubt. "A violation of the [d]efendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2007). In *Boston and Satterwhite*, our Court set forth several factors to be considered in determining whether the constitutional error of using a defendant's silence as substantive evidence of guilt was harmless beyond a reasonable doubt. *See Boston*, 191 N.C. App. at 651-52, 663 S.E.2d at 896. These factors included

> whether the State's other evidence of guilt was substantial; whether the State emphasized the fact of [the defendant's] silence throughout the trial; whether the State attempted to capitalize on [the defendant's] silence; whether the State commented on [the defendant's] silence during closing argument; whether the reference to [the defendant's] silence was merely benign or *de minimis*; and whether the State solicited the testimony at issue.

*Id.* at 652-53, 663 S.E.2d at 896-97.

In applying these factors to the present case, we hold that the trial court's error was harmless beyond a reasonable doubt. In addition to Defendant's silence, the State presented substantial evidence of Defendant's guilt based on S.A.'s account of the events, as well as the results of Dr. Stanley's physical examination which she found to reveal a possible certainty of sexual maltreatment. Additionally, the State presented the testimony of Harris who testified that Defendant admitted to holding S.A.'s breasts while wrestling and that Defendant had ended up on top of S.A. at one point. The State also presented the testimony of Pastor Longobardo who testified that Defendant told him he had had bodily contact with S.A.

Other *Boston and Satterwhite* factors support the conclusion that the trial court's error was harmless beyond a reasonable doubt in this case. The State made mention of Defendant's silence to law enforcement briefly on two occasions during the trial but these ref-

erences were *de minimis*. *See id.* Also, it does not appear from the record or the transcript that the State attempted to capitalize on Defendant's silence. *See id.*

Only two of the *Boston and Satterwhite* factors support a conclusion that the trial court's error was prejudicial: (1) the State referenced Defendant's silence to law enforcement during its closing argument, and (2) the State solicited Defendant's testimony regarding his silence. *See id.* However, having considered all of these factors, the State presented substantial evidence of Defendant's guilt other than Defendant's silence to law enforcement, and the error of referencing Defendant's silence was not prejudicial. Thus, we conclude "beyond a reasonable doubt that the jury would have reached the same verdict even had the trial court disallowed the contested testimony." *Id.* at 653-54, 663 S.E.2d at 897.

No prejudicial error.

Judges BRYANT and GEER concur.