INMAN, Judge.
Julian Rashad McKoy ("Defendant") appeals from his conviction following a jury trial on one count of taking indecent liberties with a child. Defendant argues that the trial court erred in allowing: (1) testimony by the child's therapist and mother improperly vouching for and/or bolstering the child's credibility; (2) testimony by the child's therapist attributing emotional and psychological symptoms to the alleged abuse; and (3) testimony by the arresting detective listing the constitutional rights about which she advised Defendant. After careful review of the record and applicable law, we hold that Defendant received a fair trial, free from prejudicial error.
Factual & Procedural Background
I. Substantive Facts
The evidence at trial tended to show the following:
A.G. ("Amy")[1] was born in December 1998 and was seventeen at the time of the trial. Defendant is Amy's older cousin, born January 1990.
Amy testified that Defendant first sexually abused her when she was eight years old. Amy was visiting extended family in Whiteville, and was sitting on the couch at her grandmother's house with her cousin, K.D. ("Katie"). Amy and Katie were just one year apart in age, and the two were best friends. Defendant asked Amy to walk with him to his mother's house, located next door. When they arrived, Defendant locked the front door, exposed his penis, and asked Amy to put it in her mouth. He instructed Amy to "act like it was a lollipop." After three to four minutes, Katie knocked on the front door. Defendant told Amy their interaction was a secret and told her to promise she would not tell anybody. Defendant then ran to the bathroom, and Amy opened the door and left with Katie.
Amy testified that Defendant sexually abused her on at least ten occasions in Whiteville. The abuse consisted of Defendant forcing Amy to perform oral sex on Defendant and Defendant touching her breasts and buttocks. On some of those occasions, adults caring for Amy would go to the store and leave the older cousins, including Defendant, in charge of her and other younger children.
Defendant moved to Greensboro in August 2009 to work at Katie's father's auto body shop. Defendant stayed in the house with Katie, Katie's mother, Ms. M, and Katie's father, Mr. M. Amy testified that Defendant also abused her in Greensboro, at Katie's house.
On 31 October 2009, Amy-then ten years old-traveled from Raleigh to Greensboro with her mother, Ms. F, and two older brothers for North Carolina A&T's homecoming weekend. Ms. M agreed to watch Amy and her brothers overnight so Ms. F could visit with friends.
When Ms. F and her children arrived at Ms. M's house, Defendant was not home. Amy and Katie spent the day building forts in the den. Before going to bed, they blocked off the entrance to the den with a cardboard box. Amy and Katie slept in a fort in the den; Amy's brothers slept in the living room. At the time the girls went to sleep, Defendant was not in the house.
During the night Amy woke up and discovered that the box had been moved, the covers were pulled back, and Defendant's hands were rubbing her buttocks. Amy pushed Defendant's hand away. Defendant then reached over as if he was going to touch Katie, and Amy smacked his hand out of the way. Defendant left the room, and Amy heard him in the living room. After a failed attempt at waking Katie, Amy ran upstairs and told Ms. M what happened. Ms. M promptly woke up Mr. M; Mr. M went downstairs, questioned Defendant, and brought Katie upstairs to sleep. The girls slept upstairs in the room with Ms. M.
Ms. F returned to Ms. M's home in the morning and Ms. M explained what had transpired over the night. Ms. F then stepped out of the room to speak with Mr. M, and Katie encouraged Amy to tell Ms. M about the previous incidents of abuse in Whiteville. Ms. M immediately relayed this information to Ms. F, who went downstairs and confronted Defendant. Defendant left the house. Ms. F and her children then returned to Raleigh.
The next day, Amy was examined at Raleigh Pediatrics. The examination revealed no physical injuries. On 2 November 2009, Amy and Ms. F met with Officer F.T. Wright ("Officer Wright") of the Greensboro Police Department. Officer Wright "questioned [Amy] about the event for over an hour. She couldn't remember dates, but could put timeframes with occasions like earlier in April 2008, August 2009, when her mom was at the beach." She told him that around 4:00 a.m. on 1 November, Defendant rubbed her buttocks with his hands and touched her vaginal area outside of her panties.
Officer Wright referred Amy to Detective Ruth Hines ("Detective Hines") of the Family Victims Unit, who spoke with both Ms. F and Ms. M over the phone to schedule interviews for Amy and Katie. On 17 November 2009, both Katie and Amy were interviewed at the Child Advocacy Center in Greensboro. Maria Roland conducted the individual interviews, and Detective Hines observed on a closed-circuit television feed.[2] Due to an equipment malfunction, the interview was not recorded.
Detective Hines produced a report based on her observation of the interviews, which she testified from at trial. She testified that Amy stated the abuse started in August 2007 at her grandmother's house in Whiteville and, that on 1 November 2009, she awoke to discover Defendant touching her buttocks and breasts, and went upstairs to tell her aunt and uncle what occurred.
Detective Hines also testified regarding the interview she observed between Katie and Maria Roland. Katie indicated that Amy first told her of the abuse two years prior to the interview, stating Defendant had been touching her and she was scared. Specifically, Amy told Katie that Defendant had made her "suck his private." Detective Hines observed that Katie was crying during the interview and, when asked why she was crying, explained that she should have told someone what Amy had told her.
Following the incident which resulted in Amy reporting the abuse to her family members and police, she received therapeutic counseling from Stacy Drake ("Drake"), a licensed clinical social worker. Drake used trauma-related cognitive therapy in her treatment of Amy. Drake testified that she had credentials in several specialized fields of practice, including trauma-related cognitive therapy. Drake explained her specialized treatment methods and described her interactions with Amy during the course of 24 therapy sessions.
Defendant testified on his own behalf and presented testimony from several character witnesses. Defendant denied ever inappropriately touching Amy or asking her to touch him. Defendant testified that he never saw Amy at Ms. M's home and that the trial was the first time he had seen her in seven years.
The mother of Defendant's girlfriend testified that Defendant treats children respectfully, and Defendant's friend testified that he had observed Defendant interact patiently and calmly with children. Defendant's aunt who lives in Whiteville testified that she did not recall any occasions when the older cousins watched the younger cousins.
II. Procedural History
On 2 February 2010, Defendant was indicted for one count of taking indecent liberties with a child. Detective Hines testified that at the time of the arrest, she advised Defendant of his constitutional rights. Defendant responded "yes, ma'am" indicating that he understood what Detective Hines was advising.
The case came on for trial on 2 August 2016, Judge Michael D. Duncan, presiding.
Analysis
Defendant argues that the trial court erred in allowing: (1) Drake's and Ms. K's testimony allegedly vouching for and/or bolstering Amy's credibility; (2) Drake's testimony attributing Amy's emotional and psychological symptoms to the alleged abuse; and (3) Detective Hines' recitation to the jury of the constitutional rights she advised Defendant of prior to his arrest. Each of these arguments fails, for reasons we explain below.
I. Vouching & Bolstering of Amy's Credibility
Defendant argues that Drake's testimony and Ms. K's testimony vouched for and bolstered Amy's credibility and impermissibly offered opinions that Amy had been abused.
A. Standard of Review
Defendant specifically challenges Drake's testimony explaining her own credentials; Drake's language in describing her interactions with Amy; and Ms. K's testimony regarding Amy's credibility. Defendant did not object to either Drake's or Ms. K's testimony on these matters but argues that because the trial court committed plain error, he is entitled to relief. See N.C. R. App. P. 10(a)(4) (2016) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error."). In order to establish that plain error occurred, a defendant has the burden of demonstrating that a fundamental error occurred during the defendant's trial which " 'had a probable impact on the jury's finding that the defendant was guilty.' " State v. Lawrence , 365 N.C. 506, 517, 723 S.E.2d 326, 333 (2012) (quoting State v. Odom , 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) ).
B. Discussion
The North Carolina Supreme Court has held that an expert witness in a child sexual abuse case cannot vouch for the credibility of the alleged child victim. State v. Stancil , 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002). "[T]estimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence." State v. Bailey , 89 N.C. App. 212, 219, 365 S.E.2d 651, 655 (1988) (citations omitted); see also State v. Aguallo , 322 N.C. 818, 822, 370 S.E.2d 676, 678 (1988) ("This Court has found reversible error when experts have testified that the victim was believable, had no record of lying, and had never been untruthful." (citations omitted) ). "In child sexual abuse cases, where there is no physical evidence of the abuse, an expert witness's affirmation of sexual abuse amounts to an evaluation of the veracity of the child witness and is, therefore, impermissible testimony." State v. Crabtree , --- N.C. App. ----, ---- 790 S.E.2d 709, 714, (2016)review on additional issues denied , appeal dismissed , 369 N.C. 195, 793 S.E.2d 687 (2016), and aff'd , --- N.C. ----, 804 S.E.2d 183 (2017).
1. Stacy Drake
At trial, in explaining her credentials and specializations, Drake testified that cognitive behavioral therapy is "the best kind of treatment for children that's been abused or trauma [sic]." She also testified that "[t]he last 13 years [of my work] have been specific to sexually abused children."
Defendant argues that Drake's testimony regarding her area of practice and use of cognitive behavioral therapy was improper because it implied that Amy had been abused. However, an expert's description of her therapeutic approach is not akin to an opinion on the truthfulness of a patient. Indeed, at the time Drake made the statements that Defendant now challenges, she was not testifying about Amy at all, but merely summarizing her methods and credentials. Thus, we hold that Drake's testimony explaining her credentials did not vouch for Amy's credibility. See State v. Harris , 243 N.C. App. 728, 739, 778 S.E.2d 875, 882 (2015) (holding a therapist's testimony that trauma-based cognitive therapy is used to treat victims of sexual abuse does not amount to an expert opinion on the child's credibility).
Defendant also argues that "the language Ms. Drake used in describing her interactions with [Amy] improperly bolstered [Amy's] credibility." Defendant challenges the following portion of Drake's testimony:
THE STATE: And what, if anything, did [Amy] disclose to you about her interaction with the defendant, Mr. McKoy?
DRAKE: During our sessions, she made it apparent she had been touched. Her breast had been touched, her bottom had been touched, and that she was asked to perform oral sex on multiple occasions.
We reject Defendant's argument because Drake did not testify that it was apparent to her that Amy had been touched, but merely that Amy disclosed to Drake that abuse had occurred. The prosecutor asked Drake what Amy had disclosed to her, and Drake answered accordingly. Thus, such testimony was permissible as Drake "was not testifying that she believed what the victim told her was true, nor did she give her opinion as to the victim's character for truthfulness in general." State v. Wise , 326 N.C. 421, 427, 390 S.E.2d 142, 146 (1990).
Drake also testified about her typical protocol when working with children and explained the process of developing the narrative "My Book." Drake testified that "My Book" "is a narrative where [children] have an opportunity to externalize [their] experience to make it more neutral." Defendant challenges the italicized language regarding "My Book" in the following exchange:
THE STATE: During the time you get to go [sic] know the child and working your way towards this My Book document, do you have some sort of exercises or things of that type that you have them go through in order to work through their feelings?
DRAKE: Well, it varies on age and verbal ability, that kind of thing. I think that what I believe what I do, we played feelings games and a Jenga kind-of-thing. Each of the blocks will have a feeling on it and she would give me examples and I would give examples, then I would ask her, looking at all these feelings, even though they are not every feeling in the world, can you just silently pick some blocks out, put them over here about how you felt about the touching and when you were going through the touching . So she proceeded to do that.
...
THE STATE: The second page of State's Exhibit 4-A, what is that?
DRAKE: That is called advice to others which is part of her psychoeducation. Because I asked her if friends came to you and had this kind of touching trouble , what would you advise them what you know now.
THE STATE: This isn't it [sic] about what happened to her, this is oftentimes they project their own stuff onto that. Then there is a third page.
DRAKE: My Future. It's about her future as a 10-year old and that is because in the book, we have the beginning the middle and the end. And the middle is about the abuse, the beginning is about her. And I like to finish up and say that even though this has happened , you still have a future. What is that going to look like? This is not going to stop you. I am trying to get her to try to go past the experience.
THE STATE: Again, this is not relating to anything between her and the defendant?
DRAKE: No.
(Emphasis added).
We reject Defendant's argument because Drake's testimony was not in regard to Amy specifically, but rather to the therapeutic process of creating the document "My Book" with children who have alleged sexual abuse. Drake clarified this when she confirmed, "this is not relating to anything between her and the defendant."
This Court rejected a similar argument in State v. Harris , 243 N.C. App. 728, 778 S.E.2d 875 (2015). There, the child's therapist, "who specialize[d] in working with children who have been sexually abused," id. at 731, 778 S.E.2d at 877, testified about the therapy process and her use of trauma-focused cognitive behavioral therapy. Id. at 738, 778 S.E.2d at 881. We noted that the expert witness never offered an opinion that the child was sexually abused; she merely explained how trauma-focused cognitive behavioral therapy is used to help victims of sexual abuse, described the "therapeutic techniques that she employs in her treatment," and explained the purpose and process of writing a "trauma narrative," which was subsequently offered into evidence. "The mere fact that [the expert's] testimony supports [the child's] credibility does not render it inadmissible. Accordingly, we find no error-and certainly no plain error-in the trial court's receipt of [the expert's] testimony." Id. at 739, 778 S.E.2d at 882.
Here, similar to Harris , Drake's testimony included no opinion as to whether Amy was sexually abused. She testified about her credentials, the success of trauma-focused cognitive behavior therapy for victims of sexual abuse, and the process of creating the narrative, "My Book." Thus, as in Harris , we hold that the trial court did not err, much less commit plain error, in admitting Drake's testimony.
2. Ms. K
Defendant briefly argues that two portions of Ms. K's testimony improperly vouched for her daughter. First, he challenges her testimony that "I could tell [Amy] was telling the truth" and, second, he challenges her testimony that on the day of the incident, she told her sister that "[s]omething happened and it's bad."
North Carolina Rule of Evidence 701 provides that "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2017).
This Court's decision in State v. Dew , 225 N.C. App. 750, 738 S.E.2d 215 (2013) is instructive and persuasive. In Dew , the mother of two victims of sexual assault testified "I believe my girls." Id. at 755, 738 S.E.2d at 219. This Court, assuming arguendo that the admission of the mother's testimony was improper, held that the defendant failed to show that the jury would have reached a different result absent the error. See Id. at 756, 738 S.E.2d at 219 (holding that "in view of the relatively incidental nature of the challenged statement and the fact that most jurors are likely to assume that a mother will believe accusations of sexual abuse made by her own children, we cannot conclude that the challenged portion of [the mother's] testimony had any significant impact on the jury's decision to convict [the d]efendant[ ]").
Here, assuming arguendo that Ms. K's testimony was admitted in error, Defendant has not shown that absent the challenged portions of Ms. K's testimony the jury probably would have reached a different result. Ms. K's testimony at trial was consistent with Amy's testimony and Amy's statements to Detective Wright, Detective Hines, and Drake. Given the nature of their relationship and the consistencies in Ms. K's and Amy's testimony, the jury could infer that Ms. K believed Amy and that Ms. K believed the situation was bad; but the jury also could assess for itself all of the additional evidence independent of Ms. K's testimony. Thus, we cannot hold that absent the challenged portions of Ms. K's testimony, the jury probably would have reached a different result.
II. Improper Opinion from Behavioral Symptoms
Defendant argues that the trial court erred in allowing Drake "to tie emotional and psychological symptoms to the alleged abuse." Because Drake's testimony was proper, we disagree.
A. Standard of Review
Defense counsel objected to the testimony and, thus, we review for prejudicial error. A prejudicial error occurs "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant." N.C. Gen. Stat. § 15A-1443 (2017).
B. Discussion
Defendant challenges Drake's opinion connecting symptoms to the alleged abuse in the following exchange:
THE STATE: Do you have an opinion as to whether [Amy] demonstrated behaviors consistent with sexually abused children generally?
DRAKE: Yes.
THE STATE: And what is your opinion?
DEFENSE COUNSEL: Just renew the objection for this question.
THE COURT: Overruled. You may answer.
DRAKE: My opinion is that she demonstrated particularly clusters of behaviors that are frequently seen in children who have been sexually abused.
THE STATE: And do your notes in examining [Amy] reflect what sort of behaviors you specifically observed in [Amy]?
DRAKE: Yes.
THE STATE: What are those behaviors you have documented in your notes and in your report?
DRAKE: My notes made reference to having her sleep disturbance nightmares, being irritable, being guarded, being hyper, fearful, isolating from friends, demonstrates [sic] of sexualized behavior details and sensory.
DEFENSE COUNSEL: I couldn't hear you.
DRAKE: Isolating from friends, sexualized behavior details and sensory, recalling having experiences of flashbacks and triggers.
The North Carolina Supreme Court has held that "an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." State v. Stancil , 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002). An expert may also give an "expert opinion based on her examination of the child and based on her expert knowledge concerning abused children in general." Bailey , 89 N.C. App. at 219, 365 S.E.2d at 656. This is so because "[t]he nature of [the experts'] jobs and the experience which they possess[ ] ma[k]e them better qualified than the jury to form an opinion as to the characteristics of abused children." Aguallo , 322 N.C. at 821, 370 S.E.2d at 677.
Defendant contends it was error for Drake to attribute emotional and psychological symptoms to the alleged abuse and analogizes this case to State v. Hall , 330 N.C. 808, 812, 412 S.E.2d 883, 885 (1992). In Hall , the juvenile's treating physician-tendered as an expert in pediatrics-stated her opinion that the juvenile "had a conversion reaction resulting from sexual abuse," and a different doctor-tendered as an expert in the area of child psychiatry-testified that he diagnosed the juvenile as suffering from post-traumatic stress syndrome and conversion reaction. Id. at 815, 412 S.E.2d at 886-87. The Supreme Court held the testimony that the victim suffered a conversion reaction and post-traumatic stress disorder following the alleged rape was admissible for corroborative purposes, but was inadmissible to show that a rape had occurred. Id. at 821, 412 S.E.2d at 890.
Here, unlike Hall , the treating therapist did not testify that she had diagnosed Amy. Drake's testimony regarding Amy's psychological and emotional symptoms was not offered to prove that an assault happened. The purpose of the testimony was to explain the basis for her opinion that Amy exhibited symptoms and behaviors consistent with sexually abused children. Indeed, Defendant's appellate brief acknowledges that "[t]he State's primary corroborative testimony came from Stacy Drake, a social worker who testified about her therapy sessions with [Amy]." Thus, the testimony was not admitted as substantive evidence to prove that Amy was the victim of sexual assault.
This case is also inapposite from cases in which "experts have testified that the victim was believable, had no record of lying, and had never been untruthful." Aguallo , 322 N.C. at 822, 370 S.E.2d at 678 ; see also Bailey , 89 N.C. App. at 219, 365 S.E.2d at 655 ("Our appellate courts have consistently held that the testimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence."); State v. Kim , 318 N.C. 614, 620-21, 350 S.E.2d 347, 351-52 (1986) (holding the trial court erred in allowing a doctor to testify that a victim had never been untruthful with her). An expert cannot testify that a victim's disclosures were consistent with sexual abuse, but can testify that a victim has symptoms and characteristics of sexually abused children. See State v. Frady , 228 N.C. App. 682, 685-86, 747 S.E.2d 164, 167 (2013) (holding that the testimony of a medical doctor-who had never treated the child-that the child's "disclosure was consistent with sexual abuse" based upon the "consistency of [her] statements over time, the fact that she could provide sensory details ... [and] her knowledge of the sexual act was beyond her developmental level," was "essentially express[ing] her opinion that [the child] is credible").
Here, Drake's testimony regarding Amy's symptoms was based on her observation of and discussions with Amy over the course of 24 therapy sessions. Moreover, the "expert opinion did not comment on the truthfulness of the victim or the guilt or innocence of [D]efendant," Aguallo , 322 N.C. at 823, 370 S.E.2d at 678, and, thus, was not an impermissible comment on Amy's credibility.
III. Detective Hines' Testimony
Defendant argues that the trial court erred by admitting Detective Hines' testimony that she read Defendant his constitutional rights, and that Defendant responded "yes ma'am," because that amounted to an impermissible comment on Defendant's invocation of his right to remain silent. Specifically, Defendant contends that because the case was a "close call on guilt," it was error for the prosecutor to take Detective Hines through the list of rights question by question. Because Detective Hines did not impermissibly comment on Defendant's invocation of his right to remain silent, we reject Defendant's argument.
At trial, the prosecutor asked Detective Hines to read from the statement of rights form, which she read Defendant post-arrest:
THE STATE: What was the first right you advised him:
DETECTIVE HINES: "One, you have the right to remain silent."
THE STATE: What was his response?
DETECTIVE HINES: "Yes, ma'am."
The prosecutor proceeded to take Detective Hines through the remaining rights listed on the statement of rights form in the same manner. Defense counsel timely objected and, following a bench conference, the trial court overruled the objection. The trial court explained "that as far as relevance, I believe the State has a right to show what this officer did during the course of her investigation and detective work during the course of serving the warrants."
A. Standard of Review
"The standard of review for alleged violations of constitutional rights is de novo ." State v. Graham , 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009). Section 15A-1443 of the North Carolina General Statues provides that "[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2017).
B. Discussion
"[A] defendant's exercise of his constitutionally protected rights to remain silent and to request counsel during interrogation may not be used against him at trial." State v. Elmore , 337 N.C. 789, 792, 448 S.E.2d 501, 502 (1994) (citing State v. Ladd , 308 N.C. 272, 283-84, 302 S.E.2d 164, 171-72 (1983) ). "We have consistently held that the State may not introduce evidence that a defendant exercised his Fifth Amendment right to remain silent." State v. Ladd , 308 N.C. 272, 283, 302 S.E.2d 164, 171 (1983).
The cases cited by Defendant are inapposite, as they all involve testimony-either by an officer or from the defendant-seeking to establish an inference of guilt from the defendant's exercise of his right to remain silent. See State v. Lane , 301 N.C. 382, 387, 271 S.E.2d 273, 277 (1980) (holding prejudicial error when the State cross-examined the defendant about his failure to disclose his alibi either at the time of his statement or prior to trial); State v. Shores , 155 N.C. App. 342, 352, 573 S.E.2d 237, 242 (2002) (holding prejudicial error when the State cross-examined the defendant on his post-arrest silence and referenced the defendant's silence in its closing argument).
Here, the State did not present any evidence that Defendant exercised his constitutional right to remain silent. Indeed, the State never asked Detective Hines whether Defendant invoked this right at all. Detective Hines testified that she read Defendant each right listed on the statement of rights form, and that Defendant responded, "yes ma'am" to each right. Detective Hines testified about the process of arresting Defendant; the State did not ask Detective Hines whether Defendant invoked any of his constitutional rights, did not cross-examine Defendant about whether he invoked any of his constitutional rights, and made no comment during closing arguments regarding Defendant's invocation of his right to remain silent. See Elmore, 337 N.C. at 793, 448 S.E.2d at 503 ("Neither does the record show that the defendant was cross-examined on the matter or that any other witness made reference to the defendant invoking his rights. These facts distinguish this case from other cases where this Court has found error when the prosecutor directly commented on a defendant's failure to testify or when a defendant was cross-examined about his invocation of his rights.") (citation omitted).
Thus, as no improper comment was ever specifically made regarding Defendant's decision to remain silent, we reject Defendant's argument.
Conclusion
For the foregoing reasons, we hold that Defendant received a fair trial, free from prejudicial error.
NO ERROR.
Report per Rule 30(e).
Judge DAVIS concurs.
Judge MURPHY concurs in the result only.

We use this pseudonym to protect the identity of the juvenile and for ease of reading.

Because Maria Roland was subsequently "released" from her employment and "was hostile about it," she was not called to testify.