IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-386

Filed 19 March 2025

Union County, Nos. 22CRS50252–53

STATE OF NORTH CAROLINA

v.

LAVONDA MARIE EARLEY, Defendant.

Appeal by defendant from judgments entered 8 September 2023 by Judge Jonathan W. Perry in Union County Superior Court. Heard in the Court of Appeals 15 January 2025.

*Attorney General Joshua H. Stein, by Assistant Attorney General Caden William Hayes, for the State.*

*Kaelyn N. Sweet for defendant-appellant.*

FLOOD, Judge.

Defendant, Lavonda Marie Earley, appeals from the trial court's judgments finding her guilty of attempted first degree murder and assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWIKISI"). On appeal, Defendant argues the trial court erred or plainly erred by: (A) allowing the State to repeatedly question Defendant about her failure to make a statement to law enforcement, and (B) allowing the State to reference her silence during closing argument. Upon careful review, we conclude the trial court did not plainly err in allowing the State to question

- 1 -

Defendant about her failure to make a statement to law enforcement, because Defendant cannot establish she was prejudiced by the challenged evidence, and the trial court did not abuse its discretion in failing to intervene *ex mero motu* during the State's closing argument, because the statements were not grossly improper.

## I. <u>Factual and Procedural Background</u>

On 25 January 2022, shortly before 6:00 p.m., Defendant's husband, John Stacey, returned from work and arrived at their home at 2000 Chandler Forest Court in Indian Trail, North Carolina. Stacey entered the house and saw Defendant "sitting at the desk" in the kitchen, but Defendant did not look up, and Stacey said nothing to Defendant "because [they] don't really talk." Stacey "grab[bed] a beer[,]" then went upstairs to the master bathroom, "turn[ed] on some jazz[,]" took a "scrub brush[,]" and "got in the shower[.]" Stacey left the bathroom door open. Stacey saw Defendant "pulling the [bathroom] door closed[,]" thinking that she had briefly come in to get something and left. Stacey finished showering, stepped out of the shower, and set one foot on the bathroom floor, when Defendant reentered the room and "just started shooting."

Defendant quickly tried to close the bathroom door; however, a hook on the door prevented her from closing the door. Defendant reentered the room, and Stacey asked Defendant, "why are you doing this[?]" Defendant responded: "You fucked her, you die mother fucker[.]" Defendant removed the door hook, took Stacey's phone and

wallet that were lying on the bathroom sink, locked Stacey inside the bathroom, and left the home.

Stacey first tried to call out for help through the bathroom window, to no avail. He then "crawled to the door . . . fumbled and [] got it unlocked[,]" then "crawled to the steps." He crawled out of the bathroom, through the master bedroom, down the second-floor hallway, and to the top of the stairs. Stacey then "balled up in a knot and rolled down" the stairs. He unlocked the front door, and then "rolled to the porch" where he called out for help. He then saw his neighbor, Joshua Betts, passing by.

Earlier that same day, Defendant had called Betts. Betts had "never really spoken to [Defendant,]" yet Defendant was very talkative on the phone call, resulting in "the longest conversation [Betts had] ever had with [Defendant.]" On the call, Defendant asked whether Betts and his wife would be home later in the day so that Defendant could return some Tupperware.

Around 5:30 p.m., Defendant knocked on Betts' front door with Tupperware in hand, and Betts' wife opened the door and accepted the Tupperware. Around the time Stacey began taking his shower, Betts and his wife finished their workday and went on their daily walk around the neighborhood. Betts briefly returned to the house and closed their windows because he and his wife "smelled smoke somewhere[,]" but when they resumed their walk, Betts heard "a lot of loud bangs" coming from Defendant's house. Betts "kept turning around" to look at Defendant's house, and he eventually saw Defendant at the front door, who was "struggling" with

the door lock, and "in a hurry." A few minutes later, Betts saw that Defendant's black Mercedez-Benz was gone.

Although Betts wanted to investigate, his wife "held [him] back" and "pulled [him] along for the rest of the walk." Returning in the direction of their house, Betts and his wife walked past Defendant's house. Betts saw Stacey "laying on the front steps . . . just wearing a bath towel[,]" his "head . . . hang[ing] off of some of his brick steps[,]" and "covered in blood[.]" Stacey told Betts: "Call 911 . . . my wife shot me[.]"

*Emergency Response, Investigation, and Arrest*

Deputy Jason Frazier, with the Union County Sheriff's Office, was dispatched to Defendant's home shortly after 6:00 p.m. Upon arriving at the home, Deputy Frazier saw Stacey in about the same condition as Betts observed him, and observed Stacey "had several gunshot wounds to his lower body." Deputy Frazier entered the home and observed "a blood trail that led from the front door up the stairs" and "a large amount of blood in the bathroom." He observed "busted glass on the floor and . . . [handgun] casings on the vanity and the counter and the sinks." Soon after, Steven Helms, a paramedic with the Union County EMS, arrived on the scene, began treating Stacey, observed several wounds on Stacey, and noticed he "appeared to have lost a good deal of blood." Helms subsequently transported Stacey to the hospital.

Following Stacey's transportation to the hospital, Crime Scene Investigator Paige Eason arrived at the scene. In the master bathroom, Investigator Eason observed the following: "broken glass, a large amount of blood," and "spent casings";

the glass shower door had "extensive damage"; bath towels and robes were located in the bathtub; five 9-millimeter casings located "in the sink[,]" one casing located "on top of the sink vanity[,]" and another "spent casing [] next to the bathtub"; "suspected projectile holes in the metal of the shower door frame[,]" some "on the wall located next to the shower[,]" and one "in the toilet paper holder[.]" Investigator Eason further observed: a "specific drip pattern" of blood next to the open shower door, indicating Stacey was "not moving, [or] . . . not walking at the time"; blood on the bathroom door; blood on the doorhandle; and an absence of blood where the bathmat had been located. Investigator Eason concluded: "Based on all of that information there definitely was a firearm shot in that bathroom"; "[s]omeone was standing within a particularly close distance to the vanity"; and the shooter was probably standing.

Next, Investigator Eason proceeded to the bedroom, where she observed blood stains leading from the bathroom, and through and out the bedroom, indicating movement "consistent with someone who's actively bleeding [and] crawling through that area[.]" Investigator Eason also observed that none of the items on the dresser appeared out of place, none of the bed linens were out of place, and that only one side of the bed appeared to be in use. She further observed: a "handgun box and the magazine" located towards the foot of the bed; that the magazine was loaded; and that it had "seven rounds in an eight[-]round capacity magazine." She did not locate the gun associated with the magazine or any other handguns in the home.

Sergeant Tyler Kell soon arrived at the house, was assigned lead investigator, and searched the house. He found at least two shotguns in the house, including one shotgun "tucked under" the bed, which was not easily reachable, and appeared "still [intact] as if it had just been purchased[.]" Upon inspection, he determined that the shotguns were unloaded. Sergeant Kell had also been notified that Defendant's phone number had called 911 at 6:28 p.m., and Defendant had several times repeated the phrase "[a]mbulance 2000 Chandler Forest Court." Neither Defendant nor her seventeen-year-old son, Ashton—who was not at the home at the time of the events— had been located since that time. It was later determined that Defendant had been traveling to her mother's house on "[t]he west side of Charlotte," and had crossed into Mecklenburg County at the time of the 911 call.[1] Sergeant Kell had tried to call Defendant, but Defendant never "pick[ed] up her phone[.]" Sergeant Kell further observed a "doorbell camera" on the "front side of the house[.]" Defendant had virtual access to the Ring doorbell camera during the time of the responding officers' arrival.

Law enforcement obtained a warrant to arrest Defendant the same night as the shooting. The next day, on 26 January 2022, an attorney contacted Sergeant Kell informing him Defendant would turn herself in, and she did so that afternoon. Although Sergeant Kell had requested Defendant turn in the gun she used to shoot Stacey, Defendant did not bring a gun upon her arrest. At the time of her arrest,

---

[1] The 911 operators had attempted to transfer Defendant's call to the Union County 911 Center; however, Defendant hung up the phone before the transfer was complete.

Defendant was given *Miranda* warnings and declined to make a statement to law enforcement.

Senior Crime Scene Investigator Chris McTeague entered Defendant's interview room, where she was photographed, and asked Defendant whether "she had any injuries[.]" Defendant "indicated that she did not" have any injuries, and Investigator McTeague did not observe bruising; "nicks, cuts, [or] scrapes"; or any other injuries on Defendant.

Three weeks after the shooting, Stacey, who had been in intensive care and on a ventilator, woke up in the hospital, was discharged a few weeks later, and went to live at his daughter's house. Defendant had, by this time, bonded out of jail and returned to the marital home. Stacey was granted a domestic violence protective order ("DVPO") to remove Defendant from the home. Pursuant to the DVPO, Defendant went to the Union County Sheriff's Office "to surrender a firearm[,]" which was a "pink and black Smith & Wesson M&P Shield 9[-]millimeter semiautomatic handgun."

*Trial Proceedings*

On 4 April 2022, a Union County Grand Jury returned a true bill of indictment, charging Defendant with attempted first degree murder and AWDWIKISI. On 25 August 2023, the matter proceeded to trial, and both parties presented evidence.

The following, relevant testimony was heard at trial. On direct examination of Sergeant Kell, the State asked whether he "g[a]ve [Defendant] an opportunity to

give a statement at the time that she turned herself in[.]" Defense counsel objected on the basis "that the State is trying to elicit the information that my client invoked her . . . Fifth Amendment right not to incriminate herself." The trial court overruled Defense counsel's objection, and Sergeant Kell responded affirmatively.

Later, on direct examination of Sergeant Kell, the State asked questions regarding Sergeant Kell's interactions with Defendant on 8 February 2022, where Sergeant Kell testified he had told Defendant over the phone he "didn't want to speak with [Defendant] about the shooting without her understanding that . . . she had the right to not speak with [him] about that without an attorney present[,]" because Defendant, not being in custody, "still had some rights attached to her[.]" Sergeant Kell testified Defendant wanted to discuss other topics. Defense counsel did not object to this line of questioning.

Next, during Defense counsel's cross-examination of Sergeant Kell, Sergeant Kell confirmed he did not know Defendant's version of events, to which Defense counsel responded: "[a]ll right. So you're just going on the only one side that you knew; correct?" Sergeant Kell responded affirmatively. During the State's redirect examination of Sergeant Kell, Sergeant Kell stated: "We were unable to get [] Defendant's version of events even though we tried." Defense counsel did not object to this exchange.

Defendant thereafter put on her own case, claiming self-defense. The following, relevant testimony was heard. Forensic psychologist Dr. Mina Ratkalkar

testified, among other things, that "at the time of the offense[,] it appears that [Defendant] was in a place where she thought that her life was in imminent danger. . . . [Defendant] was afraid that if she did not take action that . . . she would no longer be here." Later, the State cross-examined Deidre Johnson, a real estate broker who knew Defendant for nineteen years, asking in relevant part whether Johnson was "aware that [Defendant] never called [Sergeant] Kell[.]" Johnson replied in the negative. Defendant did not object to this colloquy.

Next, Defendant testified. According to Defendant, two days prior to the shooting, she confronted Stacey about his drug use and about his selling drugs.[2] Defendant had also previously expressed concern with the "young girl" Stacey called his "weed connection" for whom he bought gifts. Defendant would "destroy [Stacey's] weed every time [she saw] it[,]" and "took out" a camera Stacey had installed "so he could stop watching [Defendant] guard his illegal marijuana." Two days before the shooting, Defendant testified she had located, on an iPad, text messages between Stacey and his nephew that "confirm[ed] exactly what [Defendant] was talking about with [Stacey] selling drugs."

Defendant then testified as to her phone conversation with Betts the day of the shooting, explaining she called him "to go over his Trane warranty with him[,]"

---

[2] When Defendant was served with the DVPO, Defendant produced drug paraphernalia to Sergeant Michael Malloy of the Union County Sheriff's Office, alleging it belonged to Stacey; Defendant, however, had been in sole possession of the home for a little over one month before this interaction.

referring to Defendant and Stacey having previously "installed a full [HVAC] system," and that it was Defendant's "job [] to follow up[.]" Defendant also told Betts she still had to return the "container from the Christmas cookies[.]" After the phone call, Defendant left to go to her great aunt's funeral.

After she returned, Defendant was sitting in the kitchen "working on paperwork . . . that was for the divorce[,]" when Stacey returned home from work.[3] Stacey asked Defendant, "how was the funeral[,]" to which Defendant responded, "what do you care[?]" An argument ensued, with Defendant and Stacey "cursing [] back and forth [and] yelling and screaming[.]" Their argument continued upstairs into the bathroom, where Stacey got into the shower, Defendant "put[] eyeliner on[,]" and continued to argue with Stacey about his "selling drugs with [his] nephew[.]"

After Stacey got out of the shower, Defendant "grabbed his phone[,]" and screamed, "I'm going to show you how you're selling drugs[,]" after which Stacey grabbed the phone back from Defendant. They were struggling over the phone, and had moved into the adjacent master bedroom, when Stacey grabbed Defendant "by [the] neck," "pushed [her] on [to her] back onto the bed and slung [her] over the footboard of the bed." Defendant then "slid under the bed," and "[got] the gun[,]" which was already loaded. Stacey then "dragg[ed Defendant] by [her] feet[,]" screaming: "Bitch, you think I'm fucking playing with you, you think I'm fucking

---

[3] Evidence was presented that Stacey and Defendant had a strained marital relationship and that they had been regularly discussing divorce since at least 2020.

playing with you." Stacey "was pulling [Defendant] in that bathroom[,]" and Defendant testified she knew Stacey kept his "OJ Simpson knife" in the "bottom drawer."

At that point, Defendant "started firing everywhere[.]" Defendant testified she "believe[d she] was going to die" because she "didn't know what [Stacey] had done with the gun that he had took from [her]." Defendant grabbed Stacey's phone because it had "all the evidence on it"; she "took his wallet," "pushed [the] bed back over," and "laid the [loaded magazine] . . . in that box along with the gun case." At that point, Stacey "got up," and through tears stated, "baby, I'm so sorry." Defendant next testified she got in her car and left, "not thinking about anything else but getting . . . to safety." She called 911 and "gave the address" before "being disconnected[.]" Later, she retained an attorney and was "given instructions . . . not to say anything" to law enforcement.

On cross-examination, the State asked Defendant: "[I]sn't it correct that the first time the State became aware of your version of events was [twenty-two] days ago when your attorney handed me Dr. Ratkalkar's report here in the courtroom?" Defendant replied in the affirmative. The State next asked: "You never provided a statement to law enforcement in this investigation, did you?" Defendant replied in the negative. Defense counsel only objected to the last question asked by the State:

"[Y]ou never provided any outside witnesses who you allegedly told about the abuse?"[4] Defense counsel timely objected but did not provide a basis for the objection, and the trial court overruled the objection.

The State next asked Defendant if she kept a journal, which she stated she did. Defendant explained, however, that she did not produce the journal for trial or discovery. In response to the State's questioning her about not producing the journal, Defendant responded: "I don't have to make any statements to the State prior to my trial[;] . . . I had an attorney who advised me not to say anything[.]" Defense counsel did not object to this line of questioning.

The State then asked Defendant: "[Y]ou had an opportunity to give a version of your events to law enforcement; correct?" Defendant responded: "I was given instructions by my attorney not to say anything, which is my right to do so." The State replied: "It is your right. It's also your constitutional right to present whatever fabricated defense you want to a jury, isn't it?" Defense counsel objected, and the trial court sustained the objection.

The State later provided to Defendant: "You didn't give any details to the 911 operator because you didn't know what your story was going to be yet." Defendant responded: "I told them where my husband was." The State then asked: "You wouldn't answer the phone for law enforcement trying to find Ashton; correct?"

---

[4] Defendant testified that, around 2017 and 2018, Stacey began physically abusing Defendant.

Defendant responded: "I d[id]n't know that law enforcement was calling me." Defense counsel did not object to this exchange.

The State called several witnesses in rebuttal. Betts testified that his phone call with Defendant did not involve "warranty information about that HVAC system[.]" Betts further maintained that the call was "out of place[.]" Sergeant Kell testified that, as to the "scene in that bedroom[,]" nothing "indicate[d] . . . a fight [or a struggle] had occurred there at all." Sergeant Kell further testified that, "comparing the scene I saw to the testimony [Defendant] gave, I would expect to see things . . . disheveled or knocked over. . . . I just did not feel that the scene correctly represented what she alleged happened." Sergeant Kell also testified: "The probability that those [] casings . . . were able to land in that sink while she was being drug so violently that she is kicking and fighting and shooting wherever[;] . . . I find that . . . highly unlikely and improbable[.]" He testified that there were "no [bullets] in the ceiling" or even "above head level." Sergeant Kell finally testified that: "Without a doubt, . . . the physical evidence present in the bedroom and the bathroom [was not] consistent with [] Defendant's version of events[.]"

In its closing argument, the State argued that Defendant's self-defense claim was an after-the-fact creation—calling it "smoke and mirrors." The State indicated "the first mention of self[-]defense c[ame] from [] Defendant . . . the following day." The State continued: "We know that [] Defendant did not give a statement to law enforcement." The State then argued Defendant provided "repeated fabrications . . .

from that witness stand under oath[,]" and created "a story" and a "movie script" in "an attempt to hoodoo [the jury.]" After the State's closing argument, the jury left to deliberate, when defense counsel stated: "I believe it is improper in a closing argument to say that the defense was smoke and mirror." The trial court did not rule on the objection.

On 7 September 2023, the jury found Defendant guilty of both attempted first degree murder and AWDWIKISI. The trial court sentenced Defendant to 157 to 201 months' imprisonment for the attempted first degree murder verdict, and a consecutive sentence of 73 to 100 months' imprisonment for the AWDWIKISI verdict. Defendant timely appealed.

## II. **Jurisdiction**

This Court has jurisdiction to review this appeal from final judgments of a superior court, pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. **Analysis**

On appeal, Defendant argues the trial court erred or plainly erred by: (A) allowing the State to repeatedly question Defendant about her failure to make a statement to law enforcement, and (B) allowing the State to reference her silence during closing argument. We address each argument, in turn.

### A. Preservation Issues

As a preliminary matter, we address whether Defendant has preserved her alleged errors for appellate review.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. 10(a)(1). "To be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial." *State v. Snead*, 368 N.C. 811, 816 (2016) (citation and internal quotation marks omitted). Rule 10's specificity requirement "prevents unnecessary retrials by calling possible error to the attention of the trial court so that the presiding judge may take corrective action if it is required." *State v. Bursell*, 372 N.C. 196, 199 (2019).

"It is well settled that an error, even one of constitutional magnitude, that [a] defendant does not bring to the trial court's attention is waived and will not be considered on appeal." *Id.* at 199 (citation omitted); *see also State v. Ashe*, 314 N.C. 28, 39 (1985) (a "defendant's failure to object to alleged errors by the trial court operates to preclude raising the error on appeal"). Furthermore, "[w]here evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *State v. Alford*, 339 N.C. 562, 570 (1995). "Unpreserved error in criminal cases . . . is reviewed only for plain error." *State v. Lawrence*; 365 N.C. 506, 512 (2012); *see also* N.C.R. App. P. 10(a)(4). We first consider whether Defendant has preserved her alleged error for statements made at trial, before closing arguments.

### 1. <u>Statements made at trial</u>

Here, none of the statements made at trial are preserved for appellate review. Defendant references in her appellate brief several portions of testimony to which no objection was lodged by defense counsel at trial; thus, any errors arising out of any of these portions of testimony, even if they rise to the level of constitutional errors, are deemed waived on appeal. *See Bursell,* 372 N.C. at 199; *see also* N.C.R. App. P. 10(a)(1).

Further, defense counsel objected only to certain portions of testimony. First, defense counsel objected to the colloquy between the State and Sergeant Kell, where the State asked Sergeant Kell whether Defendant had been given "an opportunity to give a statement at the time that she turned herself in[,]" to which Sergeant Kell responded in the affirmative. Although defense counsel timely objected and stated that the basis for the objection was the Fifth Amendment, the State's question did not reference Defendant's silence, but merely her opportunity to give a statement. Even if the State's question could be construed as referencing Defendant's silence, this same evidence was later admitted without objection when the State asked Sergeant Kell about his knowledge of Defendant's version of events, and Sergeant Kell responded that law enforcement was "unable to get [] Defendant's version of events even though [they] tried." Because the same evidence that was previously objected to was later admitted without objection, "the benefit of the objection [was] lost[,]" and any error related to this portion of testimony is waived on appeal. *See Alford,* 339 N.C. at 570; *see also Bursell,* 372 N.C. at 199.

Finally, defense counsel objected to the State's question to Defendant that she "never provided any outside witnesses who [Defendant] allegedly told about the abuse[,]" and later to the State's question to Defendant that "[i]t's also [Defendant's] constitutional right to present whatever fabricated defense [Defendant] want[s] to a jury, isn't it?" Although defense counsel's objection in both instances was timely, defense counsel did not provide specific grounds for either objection, and because the grounds for both objections are not apparent in their respective contexts—as it is unclear to this Court whether defense counsel was objecting on Fifth Amendment grounds, related to Defendant's silence, or on other grounds—these allegations of error are not preserved for appellate review. *See* N.C.R. App. P. 10(a)(1); *see also Bursell*, 372 N.C. at 199. Next, we consider whether Defendant has preserved her alleged error for statements made by the State during closing argument.

### 2. Statements made during closing argument

Our Supreme Court has also explained that "[i]t is the general rule that an impropriety in the argument must be brought to the attention of the trial judge in time for it to be corrected[.]" *State v. Smith*, 291 N.C. 505, 521 (1977). "[The] Court is mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor." *State v. Jones*, 355 N.C. 117, 129 (2002). A defendant must object to statements made during closing argument, however, or the error is not preserved for appellate review. *See State v. Parker*, 269 N.C. App. 629, 638 (2020) ("If [a d]efendant or his counsel believes the

State's argument [during closing argument] is improper, they are obliged to speak and object to preserve the error for appellate review.").

This Court has held that an untimely objection made during closing argument failed to preserve the issue for appellate review. *See State v. Hurd*, 246 N.C. App. 281, 291 (2016) (concluding that where "the State twice argued [the d]efendant had [the victim] killed before [the d]efendant objected," such objection was untimely under N.C.R. App. P. 10(a)(1)). Similarly, our Supreme Court has concluded that, where a defendant "did not request the judge to stop the argument or to instruct the jury not to consider it[,]" and where the objection only appeared "for the first time in the case on appeal[,]" the defendant "should have excepted and moved for a mistrial before the case went to the jury, rather than wait until after verdict to make complaint[,]" and thus did not preserve the error for appellate review. *State v. Peele*, 274 N.C. 106, 114 (1968), *superseded on other grounds*, *State v. Gillard*, 386 N.C. 797 (2024). Unpreserved error for improper closing arguments is reviewed only for "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *Jones*, 355 N.C. at 133.

Here, defense counsel objected to the State's closing argument only after the State concluded its argument and after the jury left to deliberate in the jury room, stating: "I believe it is improper in a closing argument to say that the defense was smoke and mirror. . . . That is improper closing argument by the prosecutor." The objection was untimely because defense counsel, objecting only *after* the jury left to

- 18 -

deliberate, did not bring the objection "to the attention of the trial judge in time for it to be corrected[.]" *See Smith*, 291 N.C. at 521. Similar to *Peele*, where the defendant failed to object during closing argument and objected only after the case went to the jury, here, defense counsel objected only after the jury left to deliberate. *See* 274 N.C. at 114. Defense counsel "should have excepted . . . *before* the case went to the jury" so as to make a timely objection and preserve the issue for appellate review, rather than wait until after the jury left to deliberate.[5] *See id.* at 114 (emphasis added); *see also Hurd*, 246 N.C. App. at 291; *Parker*, 269 N.C. App. at 638. Because defense counsel's objection was untimely, Defendant's related allegation of error is not preserved for appellate review. *See* N.C.R. App. P. 10(a)(1); *see also Smith*, 291 N.C. at 521; *Peele*, 274 N.C. at 114.

Accordingly, none of Defendant's alleged errors are preserved for appellate review, and thus we review the statements made at trial for plain error, and whether the statements made during closing argument were grossly improper. *See Lawrence*; 365 N.C. at 512; *see also Jones*, 355 N.C. at 133; N.C.R. App. P. 10(a)(4).

**B. Testimony at Trial**

---

[5] Defense counsel objected after the trial court had instructed the jury, and the jury had left the courtroom, but before the jury commenced deliberations. Defense counsel's objection was untimely, despite having been made before the jury commenced deliberations, because it had not been made during the State's closing argument. *See Parker*, 269 N.C. App. at 638; *see also Hurd*, 246 N.C. App. at 291; *Peele*, 274 N.C. at 114.

Defendant first argues the trial court plainly erred by allowing the State to repeatedly question Defendant about her failure to make a statement to law enforcement. We disagree.

To demonstrate plain error, Defendant must satisfy a three-factor test:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a "probable impact" on the outcome, meaning that "absent the error, the jury probably would have returned a different verdict." Finally, the defendant must show that the error is an "exceptional case" that warrants plain error review, typically by showing that the error seriously affects "the fairness, integrity or public reputation of judicial proceedings."

*State v. Reber*, 386 N.C. 153, 158 (2024) (quoting *Lawrence*, 365 N.C. at 518–19). As to the second part of the test, concerning prejudice, "[t]he question is not whether the challenged evidence ma[kes] it more likely that the jury would reach the *same* result. Instead, the analysis is whether, without that evidence, the jury probably would have reached a *different* result." *Id.* at 160 (emphasis in original). "In other words, the test examines the state of all the evidence except for the challenged evidence and asks whether, in light of that remaining evidence, the jury probably would have done something different." *Id.* at 162.

Here, considering only the remaining evidence not challenged on appeal, the jury would probably not have reached a different result. *See id.* at 160, 162. The State presented overwhelming evidence from which a jury could conclude that the State's version, rather than Defendant's version, accurately explained the events.

The State presented substantial unchallenged evidence that blood, broken glass, and several 9-millimeter casings had been found in the bathroom. The State's unchallenged evidence provides that: "there definitely was a firearm shot in that bathroom"; "[s]omeone was standing within a particularly close distance to the vanity"; and the shooter was probably standing, which contradicts Defendant's account that she started firing as she was being dragged into the bathroom by Stacey.

Further, the State presented evidence that there were "no [bullets] in the ceiling" or even "above head level[,]" and that "[t]he probability that those [] casings . . . were able to land in that sink while [Defendant] was being drug so violently that she is kicking and fighting and shooting wherever" was "highly unlikely and improbable[.]" The State further presented evidence of a "specific drip pattern" of blood next to the open shower door, indicating Stacey was "not moving [or] . . . not walking at the time[,]" and presented evidence of blood stains leading from the bathroom, and through and out the bedroom, indicating movement "consistent with someone who's actively bleeding [and] crawling through that area[.]" The State's evidence supports a conclusion that Stacey crawled rather than stood up, casting doubt on Defendant's testimony that Stacey stood up and apologized.

The State also presented evidence that nothing appeared out of place in the bedroom, none of the items in the dresser appeared out of place, the linens were not out of place, and only one side of the bed appeared to be in use. The State presented Sergeant Kell's unchallenged testimony that the scene in the bedroom did not

indicate that "a fight [or a struggle] had occurred there at all[,]" directly contradicting Defendant's account that Defendant and Stacey fought and struggled in the bedroom. After Defendant's arrest, she was not observed to have any injuries, further contradicting Defendant's account of the violent fight and struggle. The State's evidence that law enforcement found no loaded guns in the house casts doubt on Defendant's account that she reached under the bed and obtained a loaded gun.

The State also presented uncontradicted evidence that the home had a Ring doorbell camera, to which Defendant had access during the time the responding officers arrived, and that Defendant's phone number had dialed 911 at 6:28 p.m., after emergency responders had arrived. The uncontradicted evidence also demonstrates Defendant did not pick up the phone when called by Sergeant Kell. Further, the State presented Betts' testimony, where he testified that the phone call between him and Defendant did not involve "warranty information about that HVAC system" and that the call was "out of place[,]" again contradicting Defendant's version of events. Finally, the State presented evidence that Defendant did not turn in the gun upon being arrested, but only after being served with the DVPO, from which a jury could question why Defendant did not turn in the gun upon being arrested.

Examining only the unchallenged evidence, there is substantial evidence that supports the State's version of events, in contradiction of Defendant's version of events, such that there is no showing that "the jury probably would have reached a *different* result." *See id.* at 160, 162. Because Defendant has not satisfied the

second factor of the three-factor plain error test, Defendant cannot demonstrate plain error. *See id.* at 158. Accordingly, the trial court did not plainly err in allowing the State to question Defendant about her failure to make a statement to law enforcement. *See id.* at 158.

### C. Statements During Closing Argument

Defendant next argues the trial court plainly erred by allowing the State to reference her silence during closing argument. We disagree.

"[P]lain error review does not apply to [statements during closing argument] because plain error is reserved for evidentiary or instructional errors." *See id.* at 163.

> Where a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. To establish such an abuse, [the] defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.

*State v. Tart*, 372 N.C. 73, 80–81 (2019) (citation omitted) (cleaned up). "[A] new trial will be granted only if the remarks were of such a magnitude that their inclusion prejudiced [the] defendant, and thus should have been excluded by the trial court." *Id.* at 82 (citation and internal quotation marks omitted). As our Supreme Court has explained:

> To warrant a new trial, the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair. In assessing whether this level of prejudice has been shown, the challenged statements must be considered in context

and in light of the overall factual circumstances to which they refer. Thus, only when it finds *both* an improper argument and prejudice will th[e] Court conclude that the error merits appropriate relief.

*Id.* at 82 (citations omitted) (cleaned up); *see also State v. Ward*, 354 N.C. 231, 265 (2001) ("[S]tatements made during closing arguments will not be examined in isolation. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred." (citation and internal quotation marks omitted)). Further, where "evidence is introduced without objection at trial and does not meet the criteria for plain error, it is well within the 'parameters of propriety' for a trial court to permit that evidence to be described in closing arguments." *Reber*, 386 N.C. at 164.

"[A] criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution." *Ward*, 354 N.C. at 266. "A defendant's decision to remain silent following his arrest may not be used to infer his guilt, and any comment by the prosecutor on the defendant's exercise of his right to silence is unconstitutional." *Id.* at 266.

This Court has held that even where the State unconstitutionally referenced the defendant's silence, when considering the record in its entirety, such reference was not prejudicial and did not require a new trial. In *State v. Adu*, this Court first concluded that where the State referenced the defendant's silence in closing

argument, the State's comment violated the defendant's Fifth Amendment right against self-incrimination. 195 N.C. App. 269, 276–77 (2009). This Court next concluded, however, that such error was harmless where the State's statements at trial as to Defendant's silence to law enforcement were *de minimis*, and "it d[id] not appear from the record or the transcript that the State attempted to capitalize on Defendant's silence."[6] *Id.* at 277–78. This Court held that "the jury would have reached the same verdict even had the trial court disallowed the contested testimony[,]" because the State presented substantial evidence of the defendant's guilt "other than [the d]efendant's silence to law enforcement," so that the error was not prejudicial. *Id.* at 278.

Here, the State's references to Defendant's silence were *de minimis* and, in context of the Record, do not rise to the level of being prejudicial to Defendant. In its closing argument that lasted for thirty-four pages of the trial transcript, the State referenced Defendant's pre-trial silence to law enforcement only four times. Defendant was not prejudiced, because as previously explained, in addition to providing evidence of Defendant's silence, the State presented substantial evidence of Defendant's guilt. *See Reber*, 386 N.C. at 160, 162. It also does not appear from the Record that the State attempted to capitalize on Defendant's silence. *See Adu*,

---

[6] In *Adu*, this Court applied the "harmless error" standard of review because the defendant timely objected during closing argument to the State's reference to the defendant's failure to speak with law enforcement. *See* 195 N.C. App. at 273, 274.

195 N.C. App. at 277–78.  As in *Adu*, where, despite the State having violated the defendant's Fifth Amendment right against self-incrimination, the defendant was not prejudiced so as to warrant a new trial, here too, the references to Defendant's silence were *de minimis*, and Defendant was not prejudiced because the State presented substantial evidence of Defendant's guilt.  *See id.* at 276–77, 278; *see also Reber*, 386 N.C. at 160, 162.  Furthermore, the challenged evidence was "well within the 'parameters of propriety' for [the] trial court to permit that evidence to be described in closing arguments" because it did not rise to the level of plain error.  *See Reber*, 386 N.C. at 164.

Considering the statements made by the State during closing argument "in context and in light of the overall factual circumstances to which they refer[,]" the statements were not of such "a magnitude that their inclusion prejudiced [D]efendant, and thus should have been excluded by the trial court."  *See Tart*, 372 N.C. at 82 (citation omitted).  Accordingly, the statements were not so "grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*."  *See id.* at 80–81.

## IV. **Conclusion**

Upon review, we conclude the trial court did not plainly err in allowing the State to question Defendant about her failure to make a statement to law enforcement, because Defendant has failed to establish she was prejudiced by the challenged evidence.  Further, the trial court did not abuse its discretion in failing to

intervene *ex mero motu* during the State's closing argument, because the statements were not grossly improper.


NO PLAIN ERROR and NO ERROR.

Judge ZACHARY concurs.

Judge TYSON dissents in separate opinion.

TYSON, Judge, dissenting.

## I. Background

This case addresses a Defendant's rights to not answer questions or make statements, and to remain silent upon the advice of counsel and for the State not to comment on, nor to use or challenge, the Defendant's assertion of those rights against them at trial. The State repeatedly violated Defendant's assertion of these rights and belittled her silence and prejudiced her before the jury. I respectfully dissent.

On 26 January 2022, the day after the shooting had occurred, Defendant's retained attorney contacted Sergeant Kell and informed him Defendant would surrender and turn herself in, and she willingly did so that afternoon. At the time of her arrest, Defendant was given *Miranda* warnings, and, on the advice of counsel, she declined to answer questions or to make any statements to law enforcement officers. From that point forward, law enforcement officers and the State were on actual notice with specific knowledge Defendant was represented by counsel and upon his advice, she would not answer questions nor make any statements. Defendant posted bond, was released from jail, and she returned to the marital home.

On direct examination, the State asked Sergeant Kell whether he "g[a]ve [Defendant] an opportunity to give a statement at the time that she turned herself in[.]" Defense counsel immediately objected and asserted "that the State is trying to elicit the information that my client invoked her [Fifth Amendment] right not to

incriminate herself." The trial court overruled Defense counsel's objection. Sergeant Kell responded, "She was." Defense counsel timely objected and stated the basis for the objection was the comment on the assertion of Defendant's Fifth Amendment rights.

Later during direct examination, the State further asked Sergeant Kell about his interactions with Defendant on 8 February 2022. Sergeant Kell testified he had initiated a call and had told Defendant over the phone he "didn't want to speak with [Defendant] about the shooting without her understanding that . . . she had the right to not speak with me about that without an attorney present[,]" because Defendant, not being in custody, *still had some rights* attached to her[.]" (emphasis supplied) Sergeant Kell testified Defendant wanted to discuss other topics, including the theft of items from her home. Sergeant Kell referred Defendant to a magistrate, and she followed by filing a larceny report. It is uncontradicted Sergeant Kell knew Defendant was represented by counsel when he had called her, and she had been instructed by counsel to not answer questions, to make no statements to law enforcement officers, and to remain silent.

During Defense counsel's cross-examination, Sergeant Kell confirmed he did not know Defendant's version of the events, to which Defense counsel responded: "[a]ll right. So you're just going on the only one side that you knew; correct?" Sergeant Kell responded affirmatively. During the State's re-direct examination of Sergeant Kell, Sergeant Kell stated: "We were unable to get [ ] Defendant's version

of events *even though we tried.*" (emphasis supplied)

The State also cross-examined Deidre Johnson, a real estate broker and defense witness, who had known Defendant for nineteen years. The State asked whether Johnson was "aware that [Defendant] never called [Sergeant] Kell[.]" Johnson replied in the negative. Again, this was a deliberate comment and disparagement by the State on Defendant's Fifth Amendment right to remain silent, as she had been expressly instructed and advised by her attorney. Defendant had timely and specifically asserted self-defense, and the facts before the jury were disputed.

Substantial and uncontradicted evidence was presented tending to show Stacey and Defendant had a strained marital relationship and had been regularly discussing divorce since at least 2020. Defendant testified Stacey had begun physically abusing her since 2017 and 2018. Defendant timely filed pre-trial notice of self-defense and later asserted self-defense, put on evidence, including expert testimony, and she testified at trial.

Dr. Mina Ratkalkar, a forensic psychologist, qualified as an expert witness and testified, "at the time of the offense[,] it appears that [Defendant] was in a place where she thought that her life was in imminent danger. . . . [Defendant] was afraid that if she did not take action that . . . she would no longer be here."

Defendant testified she had confronted Stacey, two days prior to the shooting, about his illegal drug use, selling drugs, and his relationship with a young woman.

Defendant testified she would "destroy[ Stacey's] weed every time [she saw] it[,]" and "took out" a camera Stacey had installed "so he could stop watching me guard his illegal marijuana." When Defendant was served with the DVPO and removed from the marital residence, Defendant surrendered a handgun, a shotgun, and drug paraphernalia to Union County Sheriff's Sergeant Michael Malloy and alleged it belonged to Stacey.

Defendant also testified she had located text messages between Stacey and his nephew on an iPad device two days before the shooting, that "confirm[ed] exactly what [Defendant] was talking about with [Stacey] selling drugs." Defendant also asserted concerns about Stacy's relationship and involvement with the "young girl", Stacey had called his "weed connection", and for whom he had bought gifts.

Defendant testified to a phone conversation with neighbor, Joshua Betts, the day of the shooting, explaining she had called him "to go over his Trane warranty with him[,]" referring to Defendant and Stacey having previously "installed a full [HVAC] system," and it was Defendant's "job [] to follow up[.]" Defendant also told her neighbor, Betts, that she still had to return the "container from the Christmas cookies[.]" After the phone call, Defendant left to attend her great aunt's funeral.

After she returned home, Defendant was sitting in the kitchen "working on paperwork . . . that was for the divorce[,]" when Stacey returned home from work. Stacey asked Defendant, "how was the funeral[,]" to which Defendant responded, "what do you care[?]" An argument ensued, with Defendant and Stacey "cursing []

back and forth [and] yelling and screaming[.]" Their argument continued upstairs into the bathroom, where Stacey got into the shower, Defendant "put[] eyeliner on[,]" and she continued to argue with Stacey about his "selling drugs with [his] nephew[.]"

Defendant testified after Stacey got out of the shower, Defendant "grabbed his phone[,]" and screamed, "I'm going to show you how you're selling drugs[,]" after which Stacey grabbed the phone back from Defendant. The two were struggling over the phone, and had moved into the adjacent master bedroom, when Stacey grabbed Defendant "by [the] neck," "pushed [her] on [to her] back onto the bed and slung [her] over the footboard of the bed."

Defendant testified she "slid under the bed," and "[got] the gun[,]" which was already loaded. Stacey then "dragg[ed Defendant] by [her] feet[,]" screaming: "B*tch, you think I'm f*cking playing with you, you think I'm f*cking playing with you." Stacey "was pulling [Defendant] in that bathroom[,]" and Defendant testified she knew Stacey kept his "OJ Simpson knife" in the "bottom drawer" in the bathroom.

At that point, Defendant stated she "started firing everywhere[.]" Defendant testified she "believe[d she] was going to die" because she "didn't know what [Stacey] had done with the gun that he had took from me." Defendant grabbed Stacey's phone because it had "all the evidence on it"; she "took his wallet," "pushed [the] bed back over," and "laid the [loaded magazine] . . . in the box along with the gun case." At that point, Stacey "got up," and through tears stated, "baby, I'm so sorry[.]"

Defendant next testified she got into her car and left driving toward her

mother's home in Charlotte, "not thinking about anything else but getting . . . to safety." She called 911 and "gave the address" of and sent them to the marital home where Stacey was located before "being disconnected[.]" Later, she retained an attorney and was "given instructions . . . not to say anything" to law enforcement.

On cross-examination, the State asked Defendant: "[I]sn't it correct that the first time the State became aware of your version of events was [twenty-two] days ago when your attorney handed me Dr. Ratkalkar's report here in this courtroom?" Defendant replied in the affirmative.

The State next asked: "You never provided a statement to law enforcement in this investigation, did you?" Defense counsel objected to this question. Defendant replied in the negative. The State asked "[Y]ou never provided any outside witnesses who you allegedly told about the abuse?" Defense counsel timely objected, but the trial court overruled the objection.

The State next asked Defendant if she had kept a journal, to which she stated she did. Defendant explained she did not produce the journal for trial or discovery. In response to the State's questioning her about not producing the journal, Defendant responded: "I don't have to make any statements to the State prior to my trial[;] . . . I had [retained] an attorney who advised me not to say anything[.]"

The State continued to pursue this line of questioning on her silence and then asked Defendant: "[Y]ou had an opportunity to give a version of your events to law enforcement; correct?" Defendant responded: "I was given instructions by my

attorney not to say anything, which is my right to do so." The State replied: "It is your right. It's also your constitutional right to present whatever fabricated defense you want to a jury, isn't it?" Defense counsel objected, and the trial court sustained the objection, but it failed to strike this testimony nor offer a curative instruction to the jury.

The State asked Defendant: "You didn't give any details to the 911 operator because you didn't know what your story was going to be yet." Defendant responded: "I told them where my husband was." The State then asked: "You wouldn't answer the phone for law enforcement trying to find Ashton; correct?" Defendant responded: "I d[id]n't know that law enforcement was calling me."

In its closing argument, the State argued Defendant's self-defense claim was fabricated and an after-the-fact creation and lie, calling it "smoke and mirrors[.]" The State asserted "the first mention of self[-]defense c[ame] from [] Defendant . . . the following day." The State continued: "We know that [] Defendant did not give a statement to law enforcement." The State then argued Defendant had provided "repeated fabrications . . . from that witness stand under oath[,]" and created "a story" and a "movie script" in "an attempt to hoodoo [the jury.]"

After the State's closing argument, the jury left to deliberate. Defense counsel objected and stated: "I believe it is improper in a closing argument to say that the defense was smoke and mirror." The trial court failed to rule on the objection or to further address the jury.

## II.    Preservation

As the majority's opinion correctly notes, North Carolina's appellate courts are "mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor." *State v. Jones*, 355 N.C. 117, 129, 558 S.E.2d 97, 105 (2002).  Because of this reluctance, "it is incumbent on the trial court to monitor vigilantly the course of such arguments, to intervene as warranted, to entertain objections, and to impose any remedies pertaining to those objections." *Id.*  If counsel makes improper remarks during closing argument, the trial court should implement remedies, such as "requiring counsel to retract portions of an argument deemed improper or issuing instructions to the jury to disregard such arguments." *Id.*

Defendant's argument regarding the State's improper and prejudicial comments made during closing arguments are properly preserved.  Defendant objected immediately after closing arguments, before the jury had begun deliberations, and explained in detail to the court his reasoning for waiting until the prosecutor had finished her arguments:

> MR. OSHO:  Yes, your Honor I truly don't like to make any objection during closing argument, but in the past some judges have deemed my objection to be untimely if I make it after the closing.  I believe it is improper in a closing argument to say that the defense was smoke and mirror. And you know, I have the case law I just don't have it with me today.  But that is improper closing argument by the prosecutor.  I don't want to interrupt but I want the record to reflect that I made the objection, I want the court to take

judicial notice that it's made timely because I don't want to disrupt closing by jumping up and down while she's making her closing argument.

THE COURT: Sure. So just the record reflect the objection, it was not made during the closing but for the record it's being made.

"If [a d]efendant or his counsel believes the State's argument [during closing argument] is improper, they are obliged to speak and object to preserve the error for appellate review." *State v. Parker*, 269 N.C. App. 629, 638, 839 S.E.2d 83, 89 (2020). "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). Defendant's counsel timely did so here prior to the jury beginning deliberations. *Jones*, 355 N.C. at 129, 558 S.E.2d at 105.

## III.  Closing Argument Remarks

### A. Standard of Review

The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2)

> instructed the jury to disregard the improper comments
> already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107. (citation omitted). A prosecutors' closing argument must avoid appeals to passion or prejudice. *Id*. at 135, 558 S.E.2d at 108.

When opposing counsel objects during a closing argument, we review for abuse of discretion. *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364, *cert. denied*, 540 U.S. 971, 157 L.Ed.2d 320 (2003). Our Supreme Court also cautioned that an appellate court should "not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury." *State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976). "[F]or an inappropriate prosecutorial comment to justify a new trial, it must be sufficiently grave that it is prejudicial error." *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487-88 (1992) (citation and internal quotation marks omitted).

## B. Analysis

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2023). The State has failed to carry its burden here.

Our General Statutes provide guidance about permissible commentary during a prosecutor's closing argument:

> During a closing argument to the jury an attorney *may not become abusive*, inject his personal experiences, *express his personal belief as to the truth or falsity of the evidence* or as to the guilt or innocence of the defendant, or make *arguments on the basis of matters outside the record* except for matters concerning which the court may take judicial notice.

N.C. Gen. Stat. § 15A-1230(a) (2023) (emphasis supplied).

Our Supreme Court has held:

> In North Carolina it is well settled that counsel is allowed wide latitude in the argument to the jury. Even so, counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence. A prosecutor must present the State's case vigorously while at the same time guarding against statements which might prejudice the defendant's right to a fair trial.

*State v. Hill*, 311 N.C. 465, 472-73, 319 S.E.2d 163, 168 (1984) (citations and internal quotation marks omitted).

"The prosecuting attorney should use every honorable means to secure a conviction, but it is his [or her] duty to exercise proper restraint so as to avoid misconduct, unfair methods or overzealous partisanship which would result in taking unfair advantage of the accused." *State v. Holmes*, 296 N.C. 47, 50, 249 S.E.2d 380, 382 (1978).

Our Supreme Court, quoting *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 1324 (1935), provided the following warning to prosecutors:

> The United States Attorney is the representative not of an

> ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*State v. Smith*, 279 N.C. 163, 167, 181 S.E.2d 458, 460 (1971) (quoting *Berger*, 295 U.S. at 88, 79 L. Ed. at 1324).

Although prosecutors are given wide latitude during closing arguments, the deference given to prosecutors making those remarks "is not unlimited." *State v. Hembree*, 368 N.C. 2, 19, 770 S.E.2d 77, 89 (2015) ("Judicial deference, however, is not unlimited.").

Our Supreme Court has "found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation." *State v. Rogers*, 355 N.C. 420, 462, 562 S.E.2d 859, 885 (2002) (citations omitted); *see also State v. Locklear,* 294 N.C. 210, 217, 241 S.E.2d 65, 70 (1978) ("It is improper for a lawyer to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar." (citations and internal quotation marks omitted)).

This Court has also repeatedly warned prosecutors about impermissible

statements during closing arguments and cautioned them, like Daedalus warned

Icarus, not to "fly too close to the sun":

> Notwithstanding our conclusions that Defendant has failed
> to object or to show prejudice in the prosecutor's
> statements and demonstrations to warrant a new trial, we
> find the prosecutor's words and actions troublesome.
> Without hesitation, the prosecutor flew exceedingly close
> to the sun during his closing argument. Only because of
> the unique circumstances of this case has he returned with
> wings intact. See BERGEN EVANS, DICTIONARY OF
> MYTHOLOGY 62-63 (Centennial Press 1970). We
> emphasize, "[a] prosecutor has the responsibility of a
> minister of justice and not simply that of an advocate; the
> prosecutor's duty is to seek justice, not merely to convict."
> Rev. R. Prof. Conduct N.C. St. B. 3.8 (Special
> Responsibilities of a Prosecutor) cmt. [1] (2015).

*State v. Martinez*, 251 N.C. App. 284, 296, 795 S.E.2d 386, 394 (2016).

The majority's opinion expressly recognizes, "a criminal defendant has a right

to remain silent under the Fifth Amendment to the United States Constitution, as

incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the

North Carolina Constitution." *State v. Ward*, 354 N.C. 231, 266, 555 S.E.2d 251, 273

(2001). "A defendant's decision to remain silent following his arrest may not be used

to infer his guilt, and *any comment by the prosecutor on the defendant's exercise of his

right to silence is unconstitutional*." *Id.* (emphasis supplied).

Defendant argues the prosecutor made repeated and impermissible comments

during her direct and cross examinations and closing argument. The State was well

aware Defendant had retained an attorney the day after the shooting had occurred.

Defendant's retained attorney had contacted Sergeant Kell and informed him Defendant would turn herself in and surrender, and she willingly did so that afternoon.

At the time of her arrest, Defendant was given *Miranda* warnings and, on the advice of her retained counsel, she declined to answer questions or to make any statements to law enforcement officers. Defendant also willingly surrendered the handgun, a shotgun, and evidence of her husband's drug dealing to officers after the DVPO was entered.

The prosecutor first commented on Defendant's failure to speak with law enforcement: "We know that the Defendant, nor her family, returned any calls from law enforcement." The prosecutor later stated Defendant's husband "was willing to speak to investigators." Lastly, the prosecutor argued in closing:

> [Defendant's attorney] also talked about how the State is trying to make this look like we rushed to judgment and we are somehow trying to ask for you to violate the Defendant's constitutional rights of her ability to not provide information. That is her constitutional right, ladies and gentlemen. The State wouldn't contend to you otherwise. *But it is also her right to provide the State with information ahead of time.* The State of North Carolina and the Union County *Sheriff's Office has no interest whatsoever in prosecuting someone who is innocent.* Absolutely not. That is the point that was being made, not asking you folks to violate her constitutional rights. We have afforded the Defendant a fair trial.

(emphasis supplied).

The prosecutor's comments regarding Defendant's "right to provide the State

with information ahead of time" implies a duty on Defendant to speak or answer questions. Those repeated comments, coupled with the prosecutor opining Defendant was a liar and the State of North Carolina and Union County Sheriff's Office have "no interest whatsoever in prosecuting someone who is innocent", are particularly troubling. Our General Statutes expressly prohibit a prosecutor from "express[ing] his [or her] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant[.]" N.C. Gen. Stat. § 15A-1230(a) (2023). Here, the prosecutor did exactly that, while also impermissibly and repeatedly commenting on and denigrating Defendant's constitutional right to counsel's advice and to remain silent, imputing onto her a duty to speak. U.S. Const. amend. V, VI; N.C. Const. art. I § 23.

As our Supreme Court stated in *Hembree*, and even without the benefit of counsel's recorded objection, the "prosecutor's statements to this effect were grossly improper, and the trial court erred by failing to intervene *ex mero motu.*" *Hembree*, 368 N.C. at 20, 770 S.E.2d at 90. Thus, presuming Defendant's counsel failed to timely object by interrupting the prosecutor during closing statements, Defendant was entitled to rulings on her objections and curative instructions, and was nevertheless prejudiced and deprived of a fair trial. *Id.*; *Ward*, 354 N.C. at 266, 555 S.E.2d at 273.

Defendant's prior record level shows one point for operating a vehicle with no insurance over thirty years ago. The record also shows Defendant was gainfully

employed and mother to minor children with family in the community.  She was nonetheless sentenced in the presumptive range for a minimum of 157 to 201 months for the attempted first-degree murder, and a *consecutive* sentence of a minimum of 73 to 100 months for the assault with a deadly weapon conviction arising out the single same event.

I disagree with the majority's conclusion of no error for Defendant's Constitutional rights being repeatedly violated and prejudiced before the jury in the face of multiple and clear objections.  I respectfully dissent.